FILED
United States Court of Appeals
Tenth Circuit

April 25, 2008

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

PARISH OIL CO., INC., and RAY
MOORE TIRE & PETROLEUM
SERVICE, INC.,

      Plaintiffs-Appellees,

     v.

DILLON COMPANIES, INC.
d/b/a CITY MARKET,

      Defendant-Appellant.

No. 07-1032

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. No. 1:05-CV-00081-REB-PAC)**

---

Timothy R. McDonald (Timothy G. Atkeson, Jessica Brody, and Brittany K.T.
Kauffman on the brief), Arnold & Porter LLP, Denver, Colorado, for Defendant-
Appellant.

Alphonse M. Alfano, Bassman, Mitchell & Alfano, Chartered, Washington, D.C.
(Andrew R. Shoemaker and Tamera D. Westerberg, Hogan & Hartson LLP,
Denver, Colorado, with him on the brief), for Plaintiffs-Appellees.

---

Before **TACHA**, **HARTZ** and **McCONNELL**, Circuit Judges.

---

**McCONNELL**, Circuit Judge.

We must decide, under a now-amended Colorado unfair competition statute, whether a grocery store may sell gasoline below cost if such sales are conditioned on the purchase of enough groceries above cost that the entire series of transactions comes in at a profit. We hold that it may, and therefore reverse a jury's judgment in favor of the competitors who challenged this practice.

## I.

### A.

Defendant Dillon Companies, a Kansas corporation and subsidiary of the Cincinnati-based Kroger Co., operates two of the four full-service grocery stores in the city of Montrose, Colorado, under the name City Market. One is in "downtown" Montrose; the other, two miles down Townsend Avenue on the south end of town. At those locations it also operates retail gasoline filling stations. Plaintiffs are competitors in the retail gasoline business. Parish Oil is a gasoline jobber, or wholesaler, and also operates retail filling stations in Montrose under the Phillips 66 Food Plaza and Conoco-Humdinger's Travel Shoppe names. Ray Moore Tire & Petroleum Service ("Ray Moore") operated a filling station downtown until closing shop in November, 2004.

On December 3, 2003, City Market kicked off a new promotion, the "Grocery Discount Program," allegedly intended as a pilot for a Kroger-wide plan to boost grocery sales. Under the Program, a customer who purchased a qualifying amount of goods at a City Market grocery store using his store loyalty

card would receive a one-time per-gallon discount on gasoline on his next visit to a City Market filling station, redeemable by swiping his loyalty card at the pump. The terms of the deal changed with time. From December 3, 2003 to March 2, 2004, a purchase of $25.00–$49.99 in groceries earned the customer 4¢ per gallon off the posted price of gasoline, and a purchase of $50 or more earned 8¢ off. The qualifying amount of groceries had to be purchased in a single transaction, and the gasoline discount was available only at the filling station at City Market's south store. From March 3 to November 9, 2004, a purchase of $35 or more in groceries earned 15¢ per gallon off gasoline. Separate grocery purchases over any seven-day period could be accumulated to reach the qualifying amount, and the discount could be redeemed at either City Market location. From November 10, 2004 to February 28, 2005, a purchase of $50 or more in groceries in a single transaction netted the customer a whopping 20¢ per gallon off the price of gasoline. Since March 1, 2005, any customer with a City Market loyalty card has received 3¢ per gallon off at the pump without the need to buy groceries, and those customers who buy $100 or more of City Market groceries over a calendar month have received a discount of 7¢ per gallon. In every incarnation of the program, the discount could be used only once; it applied to every grade of gasoline, expired if not redeemed within two weeks, and required that the same loyalty card be used in the grocery store and at the pump.

On the ledgers, City Market kept its groceries' and filling stations' accounts separate, so at the end of each four-week accounting period the gasoline end of the business would bill the grocery end for the total value of the discounts it had honored. It is stipulated that the Grocery Discount Program operated at a total profit; that is, "[t]he margin of profit on qualifying grocery sales, when viewed in the aggregate, fully covered the cost of the aggregate discounts offered under these programs at City Market's Montrose, Colorado stores." App. 577. But because City Market kept only aggregate figures, it is unknown how many individual customers, if any, received more in discounts at the pump than City Market had earned on their qualifying purchases of groceries.

B.

City Market's competitors cried foul. Over this period of time Parish Oil and Ray Moore had been losing substantial amounts of business, both in volume and in profit. (The amounts and causes of their losses are in contention, but when the matter came to trial a jury calculated Parish Oil's losses due to City Market's discount program at $200,000 and Ray Moore's at $281,250.) On January 14, 2005, Plaintiffs sued City Market in federal district court under Colorado's Unfair Practices Act (UPA). The UPA, Colo. Rev. Stat. §§ 6-2-101 to -117, was enacted in 1935 "to safeguard the public against the creation or perpetuation of monopolies and to foster and encourage competition by prohibiting unfair and discriminatory practices by which fair and honest competition is destroyed or

prevented." *Id.* § 6-2-102. The Act has subsequently been amended by the legislature, but at the times relevant to this case it contained two prohibitions on selling items below cost: a general prohibition against below-cost sales or gifts where the seller has a "purpose of injuring competitors and destroying competition," *id.* § 6-2-105(1)(a) (2002), and a specialized prohibition, added in 1993, applicable only to below-cost motor fuel sales and omitting the intent requirement:

> It is unlawful for any person, partnership, firm, corporation, joint stock company, or other association engaged in business within this state to engage in a pattern of selling, offering for sale, or advertising for sale motor fuel for less than the cost thereof to such vendor, when such pattern has the effect of injuring one or more competitors or destroying competition.

*Id.* § 6-2-105(1)(b) (2002), *repealed by* Act of April 16, 2007, 2007 Colo. Legis. Serv. Ch. 140, § 2 (West) (effective April 16, 2007). A below-cost sale is permissible if it is part of "an endeavor made in good faith to meet the legal prices of a competitor." *Id.* § 6-2-110(1)(d) (2002), *amended by* Act of April 16, 2007, *supra*, § 4. A violation is a misdemeanor, *id.* § 6-2-105(1)(b), and the UPA creates a private right for any person or company "injured thereby" to maintain an action for treble damages and to "enjoin the defendant from a continuance of the violations," *id.* § 6-2-111(1).

This case was brought under Section 105(1)(b), the special motor-fuel provision. The complaint accused City Market of carrying on a pattern of illegal

sales of gasoline below cost, in that City Market's posted prices were often below both City Market's cost and the prices of its competitors, and actual selling prices under the Grocery Discount Program were even lower. For instance, according to the complaint, City Market's posted price for regular unleaded gasoline was below its cost on 171 out of the 365 days between December 5, 2003 and December 3, 2004. This pattern, it was charged, had a "dramatic adverse impact on [City Market's] competitors," reducing gross margins on gasoline sales at Parish Oil's Phillips 66 station by almost 43 percent, and forcing Ray Moore out of the general gasoline retail business it had been in for 36 years. App. 31–32. The two-count complaint sought both treble damages and preliminary and permanent injunctions to bar City Market from further below-cost selling.

The district court denied the preliminary injunction. After discovery, City Market moved for summary judgment. It asserted that its Grocery Discount Program fell into an exception for combined sales. That provision, Section 113 of the UPA, which is at the heart of this appeal, provided at the times relevant to this case:

> For the purpose of preventing evasion of the provisions of this article in all sales involving more than one item or commodity and in all sales involving the giving of any concession of any kind, whether it be coupons or otherwise, the vendors' or distributors' selling price shall not be below the cost of all articles, products, commodities, and concessions included in such transactions.

Colo. Rev. Stat. § 6-2-113, *amended by* Act of April 16, 2007, *supra*, § 5.

According to City Market, this provision allows a vendor to "bundle" products, so that one item may be sold below cost if its sale is tied in an appropriate way with another item or items such that the total price is above the combined costs. Under this interpretation, a City Market gasoline sale would be bundled with the related qualifying grocery sales, if any, to determine whether the transaction as a whole generated a profit or a loss. Because, City Market argued, it was stipulated that the Grocery Discount Program operated at a net profit, there could be no "pattern" of below-cost gasoline sales, and Plaintiffs must lose.

The district court disagreed. Although it admitted that, "read literally," Section 113 supported City Market's view, it found the statute "internally and irreconcilably inconsistent" because allowing below-cost bundled sales would permit an "end-run around the underlying purposes of the UPA" in contravention of the provision's stated purpose of "preventing evasion" of the Act. App. 315–16. The court held instead that Section 113 must be read to require consideration of prices and costs item-by-item, and thus to forbid a sales scheme like the Grocery Discount Program. It therefore denied summary judgment for City Market.

The case proceeded to a three-day trial, held on October 30 – November 1, 2006, whereupon the jury found City Market liable for injuries to both Parish Oil and Ray Moore. It fixed Parish Oil's damages at $200,000 and Ray Moore's at $281,250. In response to a special interrogatory, the jury assigned responsibility

for each plaintiff's losses in the amounts of 98 percent to defendant City Market, and 1 percent each to nonparties Safeway and Bradley Petroleum, which also operated filling stations in Montrose. The district court, discounting damages for nonparty liability and then trebling the award in accordance with Section 111(1), entered a final judgment against City Market in the amount of $588,000 for Parish Oil and $826,875 for Ray Moore. It also permanently enjoined City Market from selling motor fuel below cost, irrespective of reimbursements from any grocery discount program, except as permitted under the UPA to meet a competitor's price.

City Market timely brought this appeal. We exercise jurisdiction under 28 U.S.C. § 1291, review *de novo* the district court's interpretation of the UPA, reverse, and remand.

## II.

On appeal, City Market again urges the interpretation of Colo. Rev. Stat. § 6-2-113 that the district court rejected: that it permits bundling of below-cost sales with above-cost sales. Because the meaning of the statute is a matter of law, our review is *de novo*. *Cooper v. Cent. & Sw. Servs.*, 271 F.3d 1247, 1251 (10th Cir. 2001). As we are sitting in diversity and construing a Colorado statute, we must give it the meaning it would have in the Colorado courts. *Erie R.R. v. Tompkins*, 304 U.S. 64, 77–78 (1938); *Mem'l Hosp. of Laramie County v. Healthcare Realty Trust Inc.*, 509 F.3d 1225, 1229 (10th Cir. 2007). "To

accomplish this objective, th[is] court must begin with the plain language of the statute.  If the statute is unambiguous and does not conflict with other statutory provisions, we need look no further.  If, however, the language of the statute is ambiguous, or in conflict with other provisions, we then look to legislative history, prior law, the consequences of a given construction, and the goal of the statutory scheme, to ascertain the correct meaning of [the] statute." *People v. Luther*, 58 P.3d 1013, 1015 (Colo. 2002) (internal citations omitted).

We therefore turn first to the plain language of the statute.  The operative language states: "[I]n all sales involving more than one item or commodity and in all sales involving the giving of any concession of any kind, whether it be coupons or otherwise, the vendors' or distributors' selling price shall not be below the cost of all articles, products, commodities, and concessions included in such transactions."  Colo. Rev. Stat. § 6-2-113.  We agree with the district court that, "read literally," the statute "suggest[s] the very interpretation defendant urges here: that a transaction will be considered legal so long as the price charged accounts for or exceeds the cost of all items included in the transaction."  App. 316.  Unlike the district court, however, we conclude that the literal meaning of the statute must be given effect.

The general prohibition of Section 105(1)(a) bars sales below cost if the seller has "the purpose of injuring competitors and destroying competition," and the more specific prohibition of Section 105(1)(b), since repealed, bars sellers of

motor fuel from engaging in a pattern of below-cost sales with the effect—purpose is not required—of injuring competitors or destroying competition. Colo. Rev. Stat. § 6-2-105(1)(a), (b). Section 113, entitled "Selling Below Cost," addresses sales involving more than one item. It provides that when sales of more than one item are bundled, whether in a single transaction or in the form of coupons or other concessions, compliance with the statute is determined by comparing the selling price to the cost of all items "included in such transaction[]." Thus, to use the familiar example of a fast-food outlet's value meal: if the restaurant sells a hamburger and french fries for $5, throwing in a milk shake for "free," the transaction is lawful if the cost of all of the included goods is not greater than the price. If cost to the restaurant of the hamburger is $2, the french fries $1, and the shake $1.50, the transaction would be lawful. Similarly, if a record store gives purchasers of more than $100 worth of music a coupon good for a discount on future purchases, the question is whether the sum of the costs of all goods purchased exceeds the total price charged for them.

As we read the statute, when all the items are obtained in a single transaction, it is regarded as a "sale[] involving more than one item or commodity," and when a discount is given for a later purchase, it is regarded as a "concession." Either way, however, compliance with the statute is determined by comparing the cost of all the items involved in the transaction with the sales price for all of the items.

-10-

Under this plain reading of the statute, the district court erred in denying City Market's motion for judgment as a matter of law. The parties stipulated that "[t]he margin of profit on qualifying grocery sales, when viewed in the aggregate, fully covered the cost of the aggregate discounts offered under these programs at City Market's Montrose, Colorado stores." App. 577. In other words, in the aggregate, the combined cost of groceries and gasoline did not exceed the combined selling price of these items.[1] It was an error for the district court to allow the jury to base its judgment on the price of the gasoline alone. Because the gasoline sales were bundled with the grocery sales, the statute required a comparison of the costs and prices of the transactions taken together, not separately. To compare the cost and price of gasoline in isolation from the grocery sales would be like saying the value meal in our example is unlawful because the milk shake is being given away for less than its cost.

It does not matter, under Section 113, whether we view the City Market program as a discount on the purchase of groceries, payable in the form of a lower price on gasoline, or as a discount on the purchase of gasoline received as a result of the purchase of groceries. The statute does not indulge in economically meaningless formalism. Either way, the statute asks us to compare the combined

---

[1] The records kept by City Market do not permit a comparison of costs to prices for individual purchases, but only in the aggregate. The plaintiffs do not challenge the district court's conclusion that it was permissible to evaluate compliance with the statute on the basis of the aggregate figures.

price of all items involved in the transaction to the combined cost of those items. Because it is not contested that the aggregate margin on qualifying grocery sales exceeded the aggregate discount on gasoline, City Market was not in violation of the statute.

Our interpretation is consistent with the only Colorado case interpreting Section 113, *Mastercar, Inc. v. Amoco Oil Co.*, 835 P.2d 534 (Colo. App. 1992). *Mastercar* arose from a challenge to the defendants' practice of offering a free car wash with the purchase of ten gallons of gasoline. Suit was brought under Section 105(1) of the UPA, the general prohibition on giveaways and below-cost sales.[2] Plaintiff argued that the gift of the car wash was an illegal means of competition; defendants countered that it was "a legal concession pursuant to § 6-2-113, C.R.S., wherein the sales price charged for the gasoline constitutes the consideration for both the car wash and the gasoline." *Mastercar*, 835 P.2d at 535. Siding with the defendants, the court concluded that the car wash was not a gift at all. Rather, "when consideration is paid for one product that is sold in conjunction with another product described to be 'free' or otherwise offered at no cost to the consumer, the transaction constitutes a combined sale, and thus, the product is not a gift pursuant to § 6-2-105, C.R.S." *Id.* at 536.

---

[2] This subsection was transferred to § 6-2-105(1)(a) at the same time the specific prohibition on below-cost motor fuel sales at issue in this case, § 6-2-105(1)(b), was added. Act of June 6, 1993, 1993 Colo. Legis. Serv. S.B. 93-224, § 1 (West).

In further support of its holding, the court explained the impact of Section 113 in conjunction with the other parts of the UPA which define "cost":

> The effect of these provisions is that, in any transaction in which a product or article is offered in conjunction with the purchase of another product at no "cost," or at less than "cost," the consideration paid by the purchaser must be sufficient to cover the "costs," as defined under § 6-2-105(2), of both products or articles. By mandating that a combined sale transaction may only be offered at a price above cost, under § 6-2-105(1), the General Assembly prevents the evil it sought to avoid under that portion of § 6-2-105(1) that declares it unlawful to "give" a product to a consumer "for the purpose of injuring competitors and destroying competition." If a product must be sold at or above cost, injury to competitors is averted and the purposes of § 6-2-105(1) are satisfied.

*Id*.

The present case is similar. Here, as in *Mastercar*, a customer who purchases a certain quantity of one commodity (gasoline in *Mastercar*, groceries here) is given a concession on a subsequent purchase of a different commodity (a car wash in *Mastercar*, gasoline here). The holding of *Mastercar* applies with equal force to this case: "in any transaction in which a product or article is offered in conjunction with the purchase of another product at no 'cost,' or at less than 'cost,' the consideration paid by the purchaser must be sufficient to cover the 'costs,' as defined under § 6-2-105(2), of both products or articles." *Id.*

The plaintiffs, relying on the district court, offer three grounds for distinguishing *Mastercar*. First, they note that "the *Mastercar* court was not called on to construe Section 113," making its interpretation dictum. Appellees'

-13-

Br. 22.  We do not agree.  The defendant in *Mastercar* relied on Section 113, and the Colorado court relied in part on that Section in determining that the offering of the car wash fell outside Section 105's below-cost prohibitions.  But even assuming *Mastercar*'s interpretation is technically dictum and thus not binding, we find it persuasive.  Second, the plaintiffs note that the question in *Mastercar* was whether the car wash was a "gift" rather than a below-cost sale.  We regard this as a distinction without a difference.  There is no reason to think *Mastercar* would have come out differently if the car wash had been for half price instead of for "free."  Finally, they note that the *Mastercar* court "ignored the introductory clause of Section 113." *Id.* n.12.  But the question in this case (as discussed below) is whether the introductory clause of Section 113 requires us to interpret the statute in a fashion at odds with its language; the fact that the *Mastercar* court did not do so is reason for us to take the same course, not a reason for us to distinguish the decision.[3]

Finally, we would be hesitant to adopt the plaintiffs' reading of Section 113 because it would appear to prohibit a number of ordinary commercial practices

---

[3] City Market also points to another authority: a letter opinion by the Colorado Attorney General, issued on November 26, 2002, which concluded that an earlier incarnation of the motor fuel discount program, under which grocery customers who purchased items from specified manufacturers received "free gas" vouchers, did not violate Section 105(1)(b).  Because in that situation the gasoline vendor was reimbursed by third party manufacturers, rather than (as here) from a different unit of the same retailer, we do not regard the letter as applicable to the current case.

which we do not think the legislature intended to stamp out by such vague words. Consider a cellular service provider. It sells phones for $100, above cost, but if a customer will sign a two-year service contract he may have the phone for a dollar. The plaintiffs' reading would likely prohibit this common practice, especially if the entire purchase price (for the telephone and the service plan) is not paid up front and together, because the price of the phone itself would have to be considered "separately" from the price of the cellular service. Indeed, the plaintiffs' reading would apparently render unlawful in the State of Colorado a promotional gimmick so common that it features in an episode from *Seinfeld*:

> JERRY: "Atomic Sub"? Why are you eating *there*?
>
> ELAINE: I got a card, and they stamp it every time I buy a sub. Twenty-four stamps, and I become a Submarine Captain!
>
> JERRY: What does that mean?
>
> ELAINE (embarrassed): Free sub.

*Seinfeld: The Strike* (NBC television broadcast Dec. 18, 1997). If the first twenty-four sandwiches are sold for $4 apiece at a cost to the maker of $3, the customer who follows through and redeems the offer will have spent $96 to buy $75 worth of sandwiches. But the last one is sold below cost (in fact, it is "free"), making it illegal under the plaintiffs' version of the UPA. We do not believe the Colorado legislature would have acted so cavalierly as to ban such

-15-

customer-rewards programs—indeed, to make them criminal—without more clearly expressing an intent to do so.

We therefore interpret Section 113, as it existed prior to amendment in April 2007, to mean that where the ability to make a purchase at a concession price is expressly contingent on the purchase of other goods, the concession goods are sold below cost only if the total price paid by the customer for the goods involved in such linked transactions is below the total cost of such goods.

**III.**

Neither the plaintiffs nor the district court offer a plausible alternative reading of the language of the operative provision of Section 113. As discussed below, the district court explicitly abandoned any "literal" reading of the statute in favor of an interpretation based on the court's perceived legislative purpose. In their appellate briefs, the plaintiffs deny that the operative clause of Section 113 has a "plain or literal meaning" that supports the defendant's position, Appellees' Br. 24 n.16, but they do not suggest any plausible alternative. As best we can understand their position, plaintiffs argue that because the City Market program involves a "concession" rather than a combined purchase, the correct approach is not to compare the combined price of the purchased items to the combined cost of the purchased items but to examine one side of the related transactions in isolation:

> The only transaction involving the 'giving of any concession' is the transaction in which a qualified customer purchases motor fuels at a discount. Under that provision, because the concession is not applied to the price of any of the qualifying grocery items, which purchases are made in separate transactions, the only relevant transaction is the one in which the customer purchases discounted motor fuel.
>
> The only items included in the relevant transaction are the motor fuels and the concession. The cost of the motor fuels, therefore, is combined with the cost of the concession, and compared to the price of the motor fuel to determine whether it is being sold below "cost." If City Market sells gasoline at a price lower than the combined cost of the motor fuel and the discount, the product is being sold below cost.

*Id.* at 25–26.

This seems to us a distorted interpretation of the statute. It is simply not true to say that the "only transaction involving the 'giving of any concession' is the transaction in which a qualified customer purchases motor fuels at a discount." The concession—*i.e.*, entitlement to a discount on gasoline—is "given" in connection with the purchase of groceries. When we add the cost of the groceries to the cost of the concession (*i.e.*, the discount on gasoline), and compare this to the price paid for the groceries, it is undisputed that City Market makes a profit on the entire transaction. In this respect, the situation is precisely analogous to *Mastercar*, where the concession (a free car wash) was given in connection with the purchase of gasoline.

The plaintiffs want to pretend that "the only relevant transaction is the one in which the customer purchases discounted motor fuel," but this directly contradicts the language of Section 113, which requires that when coupons or

other concessions are involved, "the vendors' or distributors' selling price shall not be below the cost of *all articles, products, commodities, and concessions included in such transactions*." When customers purchase groceries, they receive not only groceries but a concession on the price of gasoline; according to the statute, the cost of "all" of these articles must be considered in combination. To look only at the transaction where the coupon or concession is cashed in would effectively outlaw the practice of giving coupons or other bonuses to customers on one purchase, to be used in connection with another—including the transaction in *Mastercar*. That is not what the statute says.

## IV.

The district court departed from the literal meaning of Section 113 because it regarded that meaning as "internally and irreconcilably inconsistent" with the purpose of the Section, as stated in its introductory clause: "For the purpose of preventing evasion of the provisions of this article . . ." App. 316. According to the district court, the literal meaning of Section 113 would "permit [an] end-run around the underlying purposes of the UPA . . . to prevent the practice of 'loss leader' selling." *Id.* at 315. (Loss-leader selling is the practice of selling selected goods, like a Thanksgiving turkey, at a loss in order to lure customers into the store.) "Given that conclusion," the court reasoned, "a literal meaning of the statute must give way to a consideration of legislative purpose." *Id.* at 316. The district court therefore concluded that "the only rational interpretation must be

one in which the cost of each item and the cost of the concomitant concession is considered separately to determine whether that individual price is below cost." *Id.* at 317. Under that reading, the discounted price of gasoline under the City Market program must be considered "separately" from the margin of profit on qualifying grocery sales.

Even when it is true that "an absolutely literal reading of a statutory provision is irreconcilably at war with the clear congressional purpose," *United States v. Campos-Serrano*, 404 U.S. 293, 298 (1971) (quoted in App. 316–17), this entitles a court only to consider "a less literal construction." *Id.* It does not permit the court to adopt the exact opposite of the statute's operative language. The district court did not suggest any way the statute's operative language could be read to express a *prohibition* on the bundling of sales.[4]

Moreover, we do not find anything approaching an "irreconcilable" conflict between the operative provision of Section 113 and its stated purpose. According to the district court, the literal meaning of Section 113 "could not have [been] intended" by the legislature because it would "swallow the rule" (apparently Section 105) by "permit[ting] sellers to evade the UPA's ultimate goal of promoting competition by prohibiting below cost and loss leader sales." App. 317. Not so. The prohibitory terms of the UPA, under either interpretation of

---

[4] There is no suggestion here that Section 113 contains a scrivener's error, which may, when clear, be corrected by the interpreting court.

Section 113, fully ban ordinary below-cost sales. The general rule against below-cost sales is not "swallowed" merely because some sales may be made below cost if appropriately linked with above-cost sales. Rather, the rule is enforced that combined sales, treated together, must still comply with Section 105.

Even under the literal interpretation, Section 113 can be seen to thwart several kinds of evasion of Section 105. First, it negates the potential argument, albeit unlikely, that if two six-dollar harmonicas are sold together for ten dollars then neither one is really being sold below cost because the price paid can be assigned to cover the cost of either. More importantly, it clarifies the illegality of one very likely type of evasion: giving away free coupons that reduce price below cost. The UPA defines "cost," but not "price," and but for Section 113 it might have been argued that an item's selling price for purposes of the below-cost sales prohibition is its list price without respect to the application of any coupon or other concession. If that were the case, a vendor could easily skirt the law if with his right hand he priced goods at 10% above cost while with his left he doled out 50%-off coupons. By making plain that the cost of any concession must be taken into account, Section 113 prevents this.

Parish Oil argues that the district court's nonliteral interpretation of Section 113 is necessary to prevent "loss leader sales." Although, as the district court acknowledged, there is no legislative history concerning the adoption of the Colorado UPA from which its purpose may be gleaned, "[o]ne of the chief aims

-20-

of state laws prohibiting sales below cost was to put an end to 'loss-leader' selling." *Safeway Stores, Inc. v. Okla. Retail Grocers Ass'n*, 360 U.S. 334, 340 (1959). As early as 1960, the Colorado Supreme Court acknowledged that "[i]t has been said that the true purpose of acts of this character was to eliminate destructive price competition and the economic effect of the sale of 'loss leaders.'" *Flank Oil Co. v. Tenn. Gas Transmission Co.*, 349 P.2d 1005, 1012 (Colo. 1960) (quoting *Dikeou v. Food Distribs. Ass'n*, 108 P.2d 529, 531 (Colo. 1940)). We do not believe, however, that City Market's program offends the goal of stamping out genuine loss leaders.

A "leader" may be "any item which, whether by national advertising or some other way [i]s sufficiently well known so that its being displayed in front of the store or in the window attracts attention and brings people into the store to get that item." FEDERAL TRADE COMMISSION, CHAIN-STORE LEADERS AND LOSS LEADERS, S. DOC. NO. 72-51, at 3 (1932) (quoting "an official of a large drug chain"). A leader makes a particularly attractive lure when the customer knows the same product is more expensive elsewhere, so items featured as leaders are usually staples, commodities, or branded items whose customary price is familiar. *See id*. at 3, 11–14; *see also* EDWARD S. ROGERS, GOOD WILL, TRADE-MARKS AND UNFAIR TRADING 265–66 (1914); P.W.S. Andrews, *Some Aspects of Competition in Retail Trade*, 2 Oxford Econ. Papers 137, 162–63 (1950). When discounted so deeply that it is sold below the vendor's cost, the item is a "loss

leader." The loss on an item sold below cost, the vendor hopes, will be more than offset by gains in goodwill, habit-forming and customer loyalty, and the sale of other items—at regular or inflated prices—to the customer attracted by the special who does not want the hassle of a second trip to his usual store. "The loss on the 'leader' is merely an indirect way of paying for advertising the store." ALBERT HARING, RETAIL PRICE CUTTING AND ITS CONTROL BY MANUFACTURERS 15 (1935); *see generally* James D. Hess & Eitan Gerstner, *Loss Leader Pricing and Rain Check Policy*, 6 Mktg. Sci. 358 (1987).[5] As such, loss leaders can have legitimate economic purposes and effects.

The principal way in which loss-leader sales have been regarded as harmful is that the consumer may be misled "to expect what generally is not true, namely, that a store which offers such an amazing bargain is full of other such bargains," *Safeway Stores*, 360 U.S. at 340. *See* LOUIS D. BRANDEIS, *Competition That Kills*, *in* BUSINESS—A PROFESSION 236, 246–48 (1914) (reprinted from Louis D. Brandeis, *Cutthroat Prices: The Competition That Kills*, Harper's Weekly, Nov. 15, 1913, at 10–12); ROGERS, *supra*, at 266–67; Murray C. Kemp, *An Appraisal of*

---

[5] Loss-leader sales are distinguished from predatory pricing; with the latter, the vendor's hope is to drive other competitors from the market and use its consequent market power to recoup losses on underpriced goods through supracompetitive prices. *See Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 224 (1993); ROBERT H. BORK, THE ANTITRUST PARADOX 149–55 (1978) (explaining why predatory pricing is unlikely to succeed in practice).

*Loss Leader Selling*, 21 Can. J. Econ. & Pol. Sci. 245, 247–50 (1955).[6]  Under this theory, loss leaders "convey[] the idea that all a given store's merchandise is similarly low-priced."  CHARLES G. DAUGHTERS, WELLS OF DISCONTENT 172 (1937).  Brandeis called them "mis-leaders."  BRANDEIS, *supra*, at 245–46.  Thus, for instance, "[t]he advertisement by a department store of Big Ben clocks which everybody knows are universally sold at two dollars and a half, at a cut price of one dollar and ninety-eight cents gives verisimilitude to the statement which immediately follows in the same advertisement that thirty dollar suits are being sold at thirteen sixty-nine."  ROGERS, *supra*, at 265–66.

By these lights, City Market's Grocery Discount Program does not establish gasoline as a true loss leader.  Indeed, gasoline is not a "leader" at all; the customer attracted to City Market's gasoline pumps is unlikely to be lured to buy other items on the assumption that they are similarly low-priced.  Indeed, the structure of the City Market program belies the misleading effect of prototypical loss leaders.  Where the ability to purchase discounted gasoline is expressly dependent on the prior purchase of a qualifying amount of other goods, the customer openly confronts the fact that he can purchase the gasoline cheaply only as part of a special, contingent discount which is not available on other products.

---

[6] We cite economic literature from the first half of the last century because that is when the Colorado legislature enacted the UPA.  We do not mean to suggest that these theories would necessarily pass muster under more modern economics.

There is no reason to imagine that the gasoline's low price is an everyday value provided by a vendor whose retail magic must allow him to stock the entire store with other "amazing bargain[s]," *Safeway Stores*, 360 U.S. at 340. A loss leader is tied to other products with invisible strings of psychology and convenience, but in a bundled-sale program like City Market's the strings are explicit and compliance with the program's terms is required. The Submarine Captain whose twenty-fifth hoagie is free will not suppose everything at the shop—chips, sodas, and all—is a steal. If she pauses to think of the matter at all, the customer in such a situation will likely realize that the purchase of other goods is mandated precisely because the vendor needs to sell a higher volume to subsidize the discounted item.

For these reasons we cannot conclude that a program like City Market's contravenes the proffered public policy against loss leaders, or other policy of the State of Colorado. It is in this respect that we take note of the recent amendments to the UPA. In April 2007, as a direct response to the district court's opinion now under review, the Colorado legislature repealed Section 105(1)(b), the specific prohibition on below-cost motor fuel sales under which this case was brought, Act of April 16, 2007, 2007 Colo. Legis. Serv. Ch. 140, § 2 (West) (effective April 16, 2007), and rewrote Section 113 as follows:

> For the purposes of this article, in all sales involving more than one product or service and in all sales involving the giving of any concession of any kind, the combined total selling price of all

-24-

> products or services shall be compared to the combined total cost of all products or services involved in the sales to determine whether the vendor or distributor is selling below cost.

*Id.* § 5. The fact of its subsequent amendment has changed nothing about our interpretation of the old Section 113, and we express nothing of how we would interpret the new Section 113 were it before us. However, the legislature's evident attempt to negate the anti-bundling interpretation adopted by the district court is heartening, for it reassures us that the foregoing analysis cannot have strayed too far from sound and acceptable principles of public policy.

## V.

We have also reviewed the various cases Parish Oil has cited, and find that nothing in them commends another outcome than that reached above.

*Food & Grocery Bureau of Southern California, Inc. v. Ziskin*, 1941-3 Trade Reg. Serv. (CCH) ¶ 25,578, at 26,652 (Cal. Super. Ct. Dec. 28, 1940), was a suit against a grocer who would advertise "super values"; for instance, on matches: Buy two boxes at three cents apiece, get a third box for a penny. Sued under California's UPA, the grocer replied that, in such cases, although the third box was worth more than one cent, he was really selling each box for 2⅓ cents each, above cost. *Id.* The Los Angeles County Superior Court struck down this practice as illegal, holding that the alleged "super value" was in truth naught but "a bait or lure to the readers of the advertisement, leading them to believe that they were obtaining an unusual bargain." *Id.* at 26,653.

Whatever the persuasive value of this antique Superior Court case as an interpretation of California law, it is irrelevant to the quite different language of the Colorado UPA. The California statute included no analogue to Colorado's § 6-2-113, instead featuring broad, express prohibitions on "the practice of using any article or product as a 'loss leader,'" and on "any scheme of special rebates, collateral contracts, or any device of any nature whereby a sale below cost is effected in violation of the spirit and intent of any of the provisions of this act." Act of July 1, 1937, ch. 860, § 2, 1935 Cal. Stat. 2395, 2397. Moreover, we cannot accept the authority of an out-of-state decision like *Ziskin* when it would conflict with the Colorado Court of Appeals' opinion in *Mastercar*. The "free" car wash in that case was just as much a lure, but the court held that it was not a "true gift[]" because it was "given in conjunction with the purchase of another product." *Mastercar, Inc. v. Amoco Oil Co.*, 835 P.2d 534, 536–37 (Colo. App. 1992) (distinguishing *Miller's Groceteria Co. v. Food Distribs. Ass'n*, 109 P.2d 637 (Colo. 1941)). Under the terms of Section 113 and the logic of *Mastercar*, the matches in *Ziskin* would not be regarded as below-cost sales, because they were sold in conjunction with other products.

The plaintiffs also rely on *Home Oil Co. v. Sam's East, Inc.*, 199 F. Supp. 2d 1236 (M.D. Ala. 2002). In that case, Sam's Club was sued for below-cost sales of motor fuel. The company argued that the profits it earned on membership fees for its clubs more than covered its losses on gasoline. The district court held

this illegal as a matter of Alabama law—notwithstanding the existence of a "combined price" statute similar to Colorado's § 6-2-113.[7]  Its analysis, however, highlights important differences between Sam's Club's case and City Market's. First, in Alabama, the legislature had made a specific finding that

> [u]nfair competition in the marketing of motor fuel occurs whenever costs associated with the marketing of motor fuel are recovered from other operations, allowing the refined motor fuel to be sold at subsidized prices.  Such subsidies most commonly occur in one of three ways: . . . [*e.g.*,] where a business uses profits from nonmotor fuel sales to cover losses from below-cost selling of motor fuel.

Ala. Code § 8-22-2(2).  As a reflection of legislative intent, this finding makes explicit that a sales structure like the Grocery Discount Program would violate the Alabama statute.  Colorado, by contrast, has made no such finding concerning its UPA.  Second, as the *Home Oil* court pointed out, a "combined-sale statute" simply does not have much to do at all with "the purchase of a membership by the consumer and a later purchase of goods."  199 F. Supp. 2d at 1241.

Similarly, in *Star Fuel Marts, LLC v. Sam's East, Inc.*, 362 F.3d 639 (10th Cir. 2004), this Court affirmed the entry of a preliminary injunction against Sam's Club barring it from selling gasoline below cost to its members.  But Sam's had presented no argument in that case that its membership sales should be considered

---

[7] That statute provides that in all sales "involving two or more items, at least one of which items is motor fuel, at a combined price, . . . the wholesaler's or retailer's combined selling price shall not be below the cost to the wholesaler or the cost to the retailer, respectively, of the total of all articles, products, commodities, gifts, and concessions included in such transactions."  Ala. Code § 8-22-10.

together with its sales of gasoline to determine whether gasoline was sold below cost, and even if it had, the facts of that case showed that "'no rational allocation of membership fees [wa]s sufficient, as a mathematical proposition,'" to cover the company's losses on gasoline. *Id.* at 646 (quoting *Star Fuel Marts, LLC v. Murphy Oil USA, Inc.*, No. 02-CV-202, 2003 WL 742191, at \*5 (W.D. Okla. Jan. 29, 2003)). Nor does Oklahoma have a statute, like Colorado's § 6-2-113, that would arguably permit such bundling. Sam's was simply selling below cost, or so the evidence seemed to show.

**VI.**

In this case, because it did not keep transaction-by-transaction records, City Market is unable to show that each customer who bought the discounted gasoline had himself paid enough for groceries so that the company made a net profit. But, absent any showing that this accounting method was chosen in bad faith, we agree with the district court's view that it suffices that City Market's aggregate profits on groceries purchased as part of the Grocery Discount Program exceeded its aggregate losses on motor fuel sold under the program. App. 314 n.2; *see Dikeou v. Food Distribs. Ass'n*, 108 P.2d 529, 533 (Colo. 1940) (holding that, under the UPA, where "a particular method [of accounting] adopted by a merchant cannot, under the facts disclosed, be said to be unreasonable, and does not disclose an intentional evasion of the law, the method so adopted should be accepted as correct" (quoting *State v. Langley*, 84 P.2d 767, 779 (Wyo. 1938))).

Here, the evidence suggested that aggregate profit on the qualifying sales of groceries was two to five times greater than the aggregate loss on the discounted gasoline.

We do not reach any of the other issues raised by City Market in its appeal, relating to whether intent to injure competition should be required under Section 105(1)(b) and to the sufficiency of the evidence at trial.  We observe that the parties have stipulated that

> if the courts determine (upon the exhaustion of any appeals) that pursuant to C.R.S. § 6-2-113, City Market's Discount Program does not violate the UPA because the aggregate cost of the gasoline discount was fully covered by the aggregate profit City Market realized on qualifying grocery purchases made by the persons redeeming the discount, then that ruling will be dispositive of this litigation . . . .

Supp. App. 26–27.  The parties, however, have not argued on appeal the impact of this stipulation on the viability of this litigation *in toto*, so we leave that issue to the district court to resolve.

* * *

The judgment of the United States District Court for the District of Colorado is **REVERSED**, and this matter is **REMANDED** to that court for further proceedings consistent with this opinion.