**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**August 13, 2009**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**
_____

JOSEPH M. ALIOTO,

      Plaintiff-Counter-Claim
      Defendant-Appellant,

v.

TIMOTHY C. HOILES,

      Defendant-Counter-Claimant-
      Appellee.

No. 07-1533
(D. Colo.)
(D.Ct. No. 1:04-CV-00438-JLK-MEH)

_____

**ORDER AND JUDGMENT**[*]

Before **O'BRIEN**, **ANDERSON**, and **McCONNELL**, Circuit Judges.

This is the second appeal in this hotly contested case arising out of a
contingent attorney fee agreement (Fee Agreement) between Timothy Hoiles, a
Colorado resident, and Joseph Alioto, a California attorney. Relevant here, the
district court concluded the Fee Agreement failed to comply with § 6147(a)(3) of
the California Business and Professions Code. We disagree, REVERSE and

---

[*] This order and judgment is not binding precedent. 10th Cir. R. 32.1(A). Citation
to orders and judgments is not prohibited. Fed. R. App. 32.1. But it is discouraged,
except when related to law of the case, issue preclusion or claim preclusion. Any citation
to an order and judgment must be accompanied by an appropriate parenthetical notation –
(unpublished). 10th Cir. R. 32.1(A).

REMAND for further proceedings.

## I. BACKGROUND

This case has a tortured history. We recite only those facts pertinent to this appeal.[1]

In 2001, Freedom Communications, Inc., (Freedom) was a California company which owned various newspapers, magazines and broadcast television stations. Hoiles owned Freedom stock, as did his ex-wife and two daughters (we refer to the collective shares as the "Family Shares"). Hoiles wanted to be free from Freedom and to obtain a fair price for the Family Shares.[2] He directed Joseph Barletta, his business consultant and attorney, to locate an attorney to discuss the possibility of a legal action to accomplish his goal. He specifically told Barletta he wanted to hire an attorney on a contingent fee basis because he did not want a repeat of his father's experience. His father spent $6 million in

---

[1] A more complete statement of the facts may be found in our previous opinion in this case, *see Hoiles v. Alioto*, 461 F.3d 1224 (10th Cir. 2006), and in the district court's decisions. *See Alioto v. Hoiles*, 488 F. Supp. 2d 1148 (D. Colo. 2007); *Alioto v. Hoiles*, No. 04-CV-00438-JLK-MEH, 2007 WL 4557838 (D. Colo. Dec. 20, 2007) (unpublished); *Alioto v. Hoiles*, No. 04-CV-00438-JLK-MEH, 2007 WL 2572414 (D. Colo. Sept. 6, 2007) (unpublished); *Alioto v. Hoiles*, No. 04-CV-00438-JLK-MEH, 2007 WL 2298310 (D. Colo. Aug. 7, 2007) (unpublished); *Hoiles v. Alioto*, 345 F. Supp. 2d 1178 (D. Colo. 2004).

[2] Freedom was a closely-held corporation; its stock was owned by the descendants of Hoiles' grandfather. The stock was priced artificially low (less than $50.00 per share) for gift and estate tax purposes and other shareholders were unwilling to pay Hoiles more. Outsiders were reluctant to purchase a minority interest in a closely-held family business. As a result Hoiles was unable to obtain full value for the Family Shares.

attorneys' fees in the 1980s in an unsuccessful attempt to dissolve Freedom. Barletta contacted Alioto and a meeting was arranged.

In August 2001, Hoiles met with Alioto to discuss his goal and how best to obtain it. According to Alioto, Hoiles hoped to receive at least $28 million for the Family Shares. Hoiles does not remember saying this but did testify the baseline value he assigned was $93 per share (which was the figure used to settle his father's estate), approximately $62 million. Alioto said he believed he could help Hoiles and agreed to take the case on a contingent fee basis (The Family Shares were ultimately sold for $142 million).

Shortly after the meeting, Alioto proposed a contingent fee agreement to Hoiles. It provided:

> RE: <u>Freedom Communications</u>
>
> Dear Tim,
>
> This letter sets forth the bases upon which my firm will represent you in the Freedom Communications matter.
>
> 1. A $500,000 non-deductible non-refundable retainer, which has already been paid.
>
> 2. Fifteen percent (15%) of anything recovered before the filing of a complaint; 20% of anything recovered after the filing of a complaint but before the commencement of the trial; and 25% of anything recovered after the commencement of the trial. (As I said at our meeting, these percentages are lower than my customary charges because some of the recovery will necessarily include ownership that you already have.)

3. The reimbursement of out-of-pocket expenses, which include such items as transcripts, depositions, first-class travel and accommodation, photocopying, telephone, Westlaw time, etc. In connection with these costs, you have already advanced $100,000 which will be deposited in a cost fund account for your benefit, and which will be used to finance the costs as they are incurred. We shall send you a monthly statement of the costs drawn from the account. You agree to maintain this cost fund at a level of $50,000. At the conclusion of the case, anything remaining in the cost fund will, of course, be returned to you.

4. I shall be allowed to hire counsel to assist me in the prosecution of the case. Any additional counsel will not increase the amount of your fee, however, costs may be proportionately greater.

5. If you withdraw from or dismiss the case against my recommendation, you will pay a reasonable attorney fee based upon $1,000 an hour for my time and $500 an hour for the time of my co-counsel.

6. The retainer, expert fees and costs used in the prosecution of the case will not be deducted from any recovery before the application of the contingency in Paragraph 2.

7. Any expert hired in this case will be paid directly by you. However, I will choose the expert and negotiate a fee on your behalf.

8. You have the sole authority to settle the case on your behalf. However, you will not unreasonably withhold your consent to settle the case on my recommendation. If you unreasonably withhold your consent to settle the case for an amount I believe to be reasonable in all of the circumstances, I shall be allowed to withdraw from the case and paid in accordance with Paragraph 5.

> I am obliged to state that this agreement is by negotiation and not otherwise set or established by law, and that I am self-insured.
>
> If you agree to the terms of this retainer, please sign in the lower left-hand space provided for your signature, retain a copy of this agreement for your files, and return the original to me.
>
> It will be an honor and privilege to represent you in this important litigation.

(R. Vol. 1 at 18-21.)

Hoiles received the Fee Agreement but delayed signing it.[3] Nevertheless, Alioto began assembling a team of attorneys and experts, referred to as the "posse," to pursue Hoiles' goal of obtaining a fair price for the Family Shares. (R. Vol. 16 at 6125-26.) Over the next two and half years, Hoiles, with the active participation of Alioto and the posse, made repeated demands on Freedom's shareholders to purchase the Family Shares. Alioto had co-counsel draft a complaint against certain shareholders alleging a violation of California's antitrust statute and breach of fiduciary duty. The draft complaint was mailed to all Freedom shareholders and Hoiles frequently threatened to file it should the shareholders continue to thwart his desire to be bought out at a fair price.

---

[3] Hoiles did not sign the Fee Agreement and return it to Alioto until March 1, 2002. According to Hoiles, the delay was due to his concern over Paragraph 5 of the Fee Agreement. He also sent the Fee Agreement to two attorneys for their review. Alioto claims Hoiles did not sign and return the Fee Agreement until March 1 because he wanted to first attempt to sell his shares to other shareholders without Alioto's help. According to Alioto, it was only when other shareholders opted not to purchase his shares that Hoiles signed the Fee Agreement.

Additionally, Hoiles, with the assistance of Alioto and the posse, as well as a media broker, Christopher Shaw, began educating Freedom shareholders as to the value of their stock, hoping to persuade them that establishing a free market for Freedom shares was in everyone's interest.

Alioto claims these efforts ultimately led to Freedom's recapitalization in December 2003. The result was that Hoiles, his ex-wife, and two daughters received $212.71 per share (approximately $142 million) for the Family Shares.[4]

Hoiles sees things quite differently. He contends Alioto's contribution to Freedom's recapitalization was minimal and, for Alioto, serendipitous. Hoiles claims the recapitalization came as the result of the efforts of a special committee formed by Freedom's Board of Directors. In fact, Hoiles says Alioto's "continued efforts to threaten litigation and his tactics of proposing or sending letters and other communications to shareholders that contained threats . . . actually became counterproductive . . . ."[5] (R. Vol. 1 at 11.)

Alioto demanded attorneys' fees from Hoiles under the Fee Agreement based on the $142 million received for the Family Shares, which came as a

---

[4] The background facts from the perspective of Alioto and Hoiles are not directly relevant to the resolution of this appeal. They are included to provide context.

[5] That, in spite of his letter to his ex-wife and daughters prior to the recapitalization requesting their contribution to the payment of Alioto's attorneys' fees in which he said: "I truly believe that if we obtain a positive result it is in fact due to the work of Joe Barletta, Mr. Alioto, and the team . . . he assembled and Christopher Shaw." (R. Vol. 5 at 1706.)

consequence of the recapitalization. Hoiles objected and filed suit against Alioto seeking to have the court declare the Fee Agreement was void.

Originally, the district court concluded Colorado law controlled the validity of the Fee Agreement and it was invalid under Colorado law. The case proceeded to a jury trial on a quantum meruit theory; on that basis, the jury found in favor of Alioto and awarded him $1.15 million, which the district court reduced to a judgment of $650,000 after deducting the $500,000 "non-deductable non-refundable retainer" already paid.[6] We reversed because the district court erred in applying Colorado law to the dispute. Our remand included instructions for the district court to determine whether the Fee Agreement was valid under California law. *See Hoiles*, 461 F.3d at 1238.

On remand, and after protracted proceedings, the district court concluded the Fee Agreement was voidable under California law because it failed to comply with § 6147(a)(3) of the California Business and Professions Code. *See Alioto*, 488 F. Supp. 2d at 1150-53. Ultimately, the court found Hoiles had exercised his statutory right to void the Fee Agreement and reinstated the jury's quantum

---

[6] Alioto argues the quantum meruit verdict was flawed because the jury was instructed under Colorado law it was not to consider any of the fee percentages contained in the Fee Agreement or the hours worked by Alioto's co-counsel in determining the reasonable value of Alioto's services. He claims that under California law, which the parties agreed on remand applied to the quantum meruit claim, fee percentages contained in an unenforceable contingent fee agreement may be considered in determining a reasonable fee and he has standing to recover under quantum meruit not only for his own efforts but also for those of co-counsel.

-7-

meruit verdict.

## II. DISCUSSION

Section 6147 of the California Business and Professions Code states in

relevant part:

(a) An attorney who contracts to represent a client on a contingency fee basis shall, at the time the contract is entered into, provide a duplicate copy of the contract, signed by both the attorney and the client, . . . to the plaintiff . . . . The contract shall be in writing and shall include, but is not limited to, all of the following:

(1) A statement of the contingency fee rate that the client and attorney have agreed upon.

(2) A statement as to how disbursements and costs incurred in connection with the prosecution or settlement of the claim will affect the contingency fee and the client's recovery.

*(3) A statement as to what extent, if any, the client could be required to pay any compensation to the attorney for related matters that arise out of their relationship not covered by their contingency fee contract. This may include any amounts collected for the plaintiff by the attorney.*

(4) Unless the claim is subject to the provisions of Section 6146, a statement that the fee is not set by law but is negotiable between attorney and client.

(5) If the claim is subject to the provisions of Section 6146,[7] a statement that the rates set forth in that section are the maximum limits for the contingency fee agreement, and that the attorney and client may negotiate a lower rate.

---

[7] Section 6146 of the California Business and Professions Code sets limits on the amount an attorney may "contract for or collect a contingency fee for representing any person seeking damages in connection with an action for injury or damage against a health care provider based upon such person's alleged professional negligence." Cal. Bus. & Prof. Code § 6146(a).

(b) Failure to comply with any provision of this section renders the agreement voidable at the option of the plaintiff, and the attorney shall thereupon be entitled to collect a reasonable fee.

Cal. Bus. & Prof. Code § 6147 (emphasis added).

In concluding the Fee Agreement was voidable the district court said: "Under the plain language of [§ 6147(a)(3)], some sort of statement about related matters is required, even if it is a statement that there are *no* related matters not covered by the agreement for which the client could be required to pay compensation." *Id*. at 1151-52. In other words, if there are no related matters, a contingent fee agreement must include a statement saying there are no related matters.

Alioto admits the Fee Agreement does not contain a related matters statement. However, he claims such a statement is not required when, as here, there are no related matters. According to Alioto, the scope of his representation of Hoiles was unlimited, everything encompassed "in the Freedom Communications matter,"and all of Hoiles' payment obligations were fully disclosed in the Fee Agreement. To him the inclusion of the phrase "if any" in subsection (a)(3) means an affirmative statement is required only "if" there are "any" related matters for which the client could be required to pay over and above the contingent fee. His reading of § 6147(a)(3), he claims, is consistent with the legislative purpose – to bring to the client's attention any additional charges for which the client may be liable. If there are none, the goal of full and fair

disclosure is satisfied, even without a related matters statement.

Predictably, Hoiles has a different view of the matter. He argues the district court was correct – § 6147(a)(3)'s referral to "if any" relates to the content of the statement, not the requirement for a statement. According to Hoiles it is unnecessary to consider whether or not there were, in fact, related matters because if there were none the statute requires a statement saying, in essence, "there are no related matters." He claims he properly exercised his right under § 6147(b) to void the Fee Agreement and to be liable only for hours Alioto billed.

The California Supreme Court has not addressed the operative statutory provision and no California appeals court has directly spoken to this issue. We could ask the California Supreme Court to resolve this "unsettled and dispositive" issue of state law. *Kan. Judicial Review v. Stout*, 519 F.3d 1107, 1119-20 (10th Cir. 2008) (quotations omitted); *see* California Rules of Court, Rule 8.548. We can certify an issue *sua sponte*, *id*. at 1120, but we typically take our cue from counsel.[8] Alioto suggested certification in his opening brief; Hoiles has never asked for certification. At oral argument, when asked by the panel if certification

---

[8] When a request to certify a question is made for the first time on appeal it may appear the loser in the district court is merely looking for a way out of an unfavorable decision. However, as Alioto informed us at oral argument, California's certification rules allow for certification only upon request of "the United States Supreme Court, a United States Court of Appeals, or the court of last resort of any state, territory, or commonwealth." *See* California Rules of Court, Rule 8.548(a).

might be appropriate, both parties said no. We decline to certify the issue and are left to predict how the California Supreme Court would resolve it.

Because we discern no useful guidance in California appellate decisions[9] we start with general principles of statutory construction and review de novo the district court's interpretation of § 6147. *Parish Oil Co. v. Dillon Cos.*, 523 F.3d 1244, 1248 (10th Cir. 2008). As we are sitting in diversity and construing a California statute, we must attempt to discern meaning as would California courts. *See id*. In doing so we look to the text of the statute, accord meaning to all of the words used by the legislature and consider all words in context – the context being 1) the sentence, 2) the subpart and 3) the entire section.

Not surprisingly, California courts start statutory construction with the text

---

[9] The California courts of appeals have discussed various aspects of § 6147. Hoiles relies on a number of these cases arguing strict compliance with the statute is required. *See Fergus v. Songer*, 59 Cal. Rptr. 3d 273 (Cal. Ct. App. 2007); *Alderman v. Hamilton*, 252 Cal. Rptr. 845 (Cal. Ct. App. 1988); *Dalgarn v. Talon Instruments, Inc.*, No. B160640, 2004 WL 886326 (Cal. Ct. App. April 27, 2004) (unpublished). But the pertinent question here is what the statute requires, not whether attorneys should be strictly held to statutory requirements. None of these cases are on point. In *Fergus*, the court concluded a contingent fee agreement and modification thereof did not comply with § 6147 because they were not signed by the client and/or did not contain "a statement that the fee is not set by law but is negotiable between attorney and client" as required by § 6147(a)(4). 59 Cal. Rptr. 3d at 278, 288. In *Alderman* the court said: "The agreement did not include a statement of how disbursements would affect the contingency fee; it did not discuss related matters; and it did not state that the fee was negotiable." 252 Cal. Rptr. at 848. In *Dalgarn*, a nonpublished/noncitable decision, the court said: "Among the requirements of section 6147 are a 'statement as to what extent, if any, the client could be required to pay any compensation to the attorney for related matters that arise out of their relationship not covered by their contingency fee contract' and a 'statement that the fee is not set by law but is negotiable between attorney and client.' (§ 6147, subds. (a)(3), (a)(4).) The February 1994 writing contains neither statement." 2004 WL 886326, at *4.

-11-

of the statute.

> As in any case involving statutory interpretation, our fundamental task is to determine the Legislature's intent so as to effectuate the law's purpose.  Statutory interpretation begins with an analysis of the statutory language.  If the statute's text evinces an unmistakable plain meaning, we need go no further.  If the statute's language is ambiguous, we examine additional sources of information to determine the Legislature's intent in drafting the statute.

*Olson v. Auto. Club of S. Cal.*, 179 P.3d 882, 884 (Cal. 2008) (citations and quotations omitted).  The crux of this matter lies in the words, "if any," as used in § 6147(a)(3): "The [contingency fee] contract shall be in writing and shall include . . . [a] statement as to what extent, **if any**, the client could be required to pay any compensation to the attorney for related matters that arise out of their relationship not covered by their contingency fee contract."  (Emphasis added).  Since all the words used by the legislature have meaning, courts must avoid reading a statute so as to render any superfluous.[10]

Had the legislature omitted "if any" and said simply that the contract must include "[a] statement as to what extent the client could be required to pay . . . . for related matters . . . ," some statement would be necessary to respond to the

---

[10] "In construing the words of a statute . . . to discern its purpose, the provisions should be read together; an interpretation which would render terms surplusage should be avoided, and every word should be given some significance, leaving no part useless or devoid of meaning."  *City & County of San Francisco v. Farrell*, 648 P.2d 935, 938 (Cal. 1982); *see also Shaw v. People ex rel. Chiang*, 96 Cal. Rptr. 3d 379, 395 (Cal. Ct. App. 2009) ("In interpreting a statute we are required, if possible, to give significance and effect to each word and phrase and to avoid a construction that makes any part of the statute superfluous or meaningless.").

statutory command to describe the extent of related matters.[11]  The response might be "to no extent" or it might detail the extent, but some statement would clearly be required.  Under Hoiles' reading, the statute means the same thing whether or not the words "if any" are included.  His reading renders those words superfluous and we reject it.

In according meaning to the phrase we start by making explicit what is implicit – a contingent fee agreement must include "[a] statement as to what extent, if [there is] any [extent], the client could be required to pay . . . ."  Thus read, disclosure of related matters is required only to the extent there are related matters.  If there are no related matters there is nothing to disclose and no statement is necessary.

Putting the phrase and sentence in a larger context is also important, because words, like people, are known by the company they keep.[12]  *See Lungren*

---

[11]  Compare subsection 6147(a)(2), discussed *infra*, which requires "[a] statement as to how disbursements and costs incurred in connection with the prosecution or settlement of the claim will affect the contingency fee and the client's recovery."

[12]  [A]nother canon of statutory construction, *noscitur a sociis*, which counsels that the meaning of an unclear word or phrase should be determined by the words immediately surrounding it.  Of course *noscitur a sociis* is just an erudite (or some would say antiquated) way of saying what common sense tells us to be true: A word is known by the company it keeps-that is to say, which of various possible meanings a word should be given must be determined in a manner that makes it fit with the words with which it is closely associated.

*James v. United States*, 550 U.S. 192, 222 (2007) (Scalia, J., dissenting) (citations and

-13-

*v. Deukmejian*, 755 P.2d 299, 304 (Cal. 1988) ("The meaning of a statute may not be determined from a single word or sentence; the words must be construed in context, and provisions relating to the same subject matter must be harmonized to the extent possible . . . . [E]ach sentence must be read not in isolation but in the light of the statutory scheme . . . ."). The "if any" language (or other similar qualifier) is notably absent from the other subsections of § 6147(a), in particular subsection (a)(2), which requires "[a] statement as to how disbursements and costs incurred in connection with the prosecution or settlement of the claim will affect the contingency fee and the client's recovery." We consider the difference significant. A contingent fee agreement might provide that disbursements and costs will not affect the contingency fee, for instance if the client were required to pay those items directly as they are incurred. Because § 6147(a)(2) contains no qualifying language we read it (as we would read § 6147(a)(3) if it did not contain the "if any" qualifier) to always require a statement. In Paragraphs 3, 4 and 7, this contingent fee agreement explains how disbursements and costs are to be handled. Unlike subsection (a)(2), subsection (a)(3) contains the qualifying phrase "if any" and, in the context of § 6147, dictates a different result. *See Farrell*, 648 P.2d at 940 (rejecting interpretation of "special taxes" in one section

quotations omitted); *see also Grafton Partners L.P. v. Superior Court*, 116 P.3d 479, 487 (Cal. 2005) ("Under th[e] canon [of *noscitur a sociis*], the meaning of a word may be ascertained by reference to the meaning of other terms which the Legislature has associated with it in the statute, and its scope may be enlarged or restricted to accord with those terms.") (quotations omitted).

of the proposition as meaning "any taxes" because (1) such interpretation would require "read[ing] the word 'special' out of the phrase 'special taxes'" and (2) the language of another section of the same proposition showed that its "drafters knew how to say 'any' taxes when that is what they meant").

Since the language of the statute is clear we need not inquire further into legislative intent, but our interpretation is faithful to the California legislature's obvious concern that contingent fee contracts adequately state the parties' agreement to the end that the client is not misled or mistreated. If there are no related matters and the attorney does not seek additional compensation, both the client and the attorney have received the full benefit of their bargain. But if there is no statement of related matters, indicating there are none, and an attorney seeks additional fees for performing services for "related matters that arise out of their relationship not covered by their contingency fee contract" he does so at his peril. He runs the risk of invalidating the entire contingent fee agreement, not merely forfeiting his right to an additional fee. For instance, in *Tishgart v. DeJesus*, an attorney had a written 40% contingent fee agreement with his client; it contained no statement of related matters. The attorney refused to perform services requested by the client and within the scope of the contingent fee contract. He later sued the client for the 40% contingent fee and an additional $9,300 in fees. No. A104244, 2004 WL 1941193, at *3 (Cal. Ct. App. Aug. 31, 2004)

(unpublished).[13] The court concluded his actions in the absence of a related matters statement addressing possible additional fees rendered the entire fee agreement voidable by the client. *Id*.

Alioto says if we conclude the court erred in its interpretation of § 6147(a)(3), we should remand the case with instructions to enter judgment in his favor on the breach of contract claim. He claims there is no question he is entitled to $21,293,170, which represents 15% of the amount realized for the Family Shares ($142 million) as a result of Freedom's recapitalization. He claims too much. Our decision is narrow: § 6147(a)(3) requires no related matters statement if there are no related matters. Whether or not there were related matters is disputed, like most other things in this case.

If Alioto claimed additional compensation for related matters, as did the attorney in *Tishgart*, it would likely (perhaps conclusively) suggest undisclosed related matters existed, permitting Hoiles to void the Fee Agreement. Hoiles argues Alioto tried to collect for the recovery of his ex-wife and daughters' shares, even though they were not mentioned in the Fee Agreement. That may be an issue pertaining to the scope of the agreement, rather than a related matter. In any event it is an issue we do not decide. Hoiles also calls attention to Alioto's attempt to initially collect 20% rather than 15% based upon an alleged oral

---

[13] Like *Dalgarn*, *Tishgart* is a nonpublished/noncitable decision. We reference it only for comparison, not its value as precedent.

-16-

agreement. Alioto has dropped that claim, but if it amounted to an attempt to charge for an undisclosed related matter it may be fatal to his claim of entitlement to a contingent fee; that is also an issue we do not decide. And even more questions remain.

Hoiles' argument that the Fee Agreement was voidable under California law was not limited to its noncompliance with § 6147(a)(3). He also claimed it violated other subsections of § 6147, as well as § 6148 of the California Business and Professions Code and Rule 3-300 of the California Rules of Professional Conduct.[14] While the district court suggested § 6148 and Rule 3-300 did not apply to the Fee Agreement, at least not to its contingency fee provision, it also said the Fee Agreement's compliance with § 6148 and Rule 3-300 was irrelevant based on its determination the Fee Agreement was voidable due to its noncompliance with § 6147(a)(3). That issue is now resurrected.

The parties also dispute the proper interpretation of the Fee Agreement. For instance, they dispute whether the phrase "anything recovered" allows Alioto a fee based on a percentage of the amount received by Hoiles as result of Freedom's recapitalization or whether the phrase contemplates a fee only if

_____

[14] Section 6148 sets forth the requirements of attorney fee contracts "[i]n any case not coming within Section 6147 in which it is reasonably foreseeable that total expense to a client, including attorney fees, will exceed one thousand dollars ($1,000)." Cal. Bus. & Prof. Code § 6148(a). Rule 3-300 sets forth the requirements an attorney must follow in order to "enter into a business transaction with a client; or [to] knowingly acquire an ownership, possessory, security, or other pecuniary interest adverse to a client."

Hoiles receives a settlement or judgment, neither of which, Hoiles argues, occurred.

Although contract interpretation is a question of law for the court, resort to extrinsic evidence may be required in this case. *See ASP Props. Group, L.P. v. Fard, Inc.*, 35 Cal. Rptr. 3d 343, 349-50 (Cal. Ct. App. 2005) ("The precise meaning of any contract . . . depends upon the parties' expressed intent, using an objective standard . . . . When there is ambiguity in the contract language, extrinsic evidence may be considered to ascertain a meaning to which the instrument's language is reasonably susceptible.") (quotations omitted). And that extrinsic evidence, at least as to whether the Fee Agreement covered the shares of Hoiles' ex-wife and daughters, is disputed. It is unnecessary to detail other disputed matters. Suffice to say that there is more work to be done in this case.

The detailed issues, as well as these others, are best addressed by the district court in the first instance. Certainly they preclude us from holding Alioto is entitled to judgment as a matter of law on his breach of contract claim.

**REVERSED** and **REMANDED**.

While this appeal was pending, Alioto filed a "Motion to Protect Escrow," claiming Hoiles demanded that Freedom release the $21,293,170 (plus interest) which was placed in escrow after Freedom's recapitalization. Attached to the motion is a letter from Hoiles' counsel to Freedom seeking the escrow funds be released to Hoiles' trust and referencing the district court's reinstatement of the

-18-

jury's quantum meruit verdict on remand.  Hoiles argues the motion should be denied as he was merely requesting that Freedom interplead the escrow funds in the district court or disburse them in accordance with the district court's judgment.  In light of our reversal and remand, we **DENY** Alioto's motion.  That, like the other remaining issues, is best resolved by the district court.

**Entered by the Court:**

**Terrence L. O'Brien**
United States Circuit Judge