**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**August 2, 2013**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

JOSEPH M. ALIOTO,

      Plaintiff-Counter-Claim-
      Defendant-Appellant,

v.

TIMOTHY C. HOILES,

      Defendant-Counter-
      Claimant-Appellee.

No. 10-1441
(D.C. No. 1:04-CV-00438-CMA-MEH
and 1-04-CV-02322-PSF-CBS)
(D. Colo.)

**ORDER AND JUDGMENT**[*]

Before **KELLY**, **SEYMOUR**, and **O'BRIEN**, Circuit Judges.

      Timothy Hoiles, a Colorado resident, and Joseph Alioto, a California attorney,

entered into a written contingency attorney fee agreement (Fee Agreement or

Agreement). Section 6147(a)(3) of the California Business and Professions Code

---

[*] This order and judgment is an unpublished decision, not binding precedent. 10th
Cir. R. 32.1(A). Citation to unpublished decisions is not prohibited. Fed. R. App. 32.1.
It is appropriate as it relates to law of the case, issue preclusion and claim preclusion.
Unpublished decisions may also be cited for their persuasive value. 10th Cir. R. 32.1(A).
Citation to an order and judgment must be accompanied by an appropriate parenthetical
notation – (unpublished). *Id.*

requires contingency fee agreements to contain, *inter alia*, "[a] statement as to what extent, if any, the client could be required to pay any compensation to the attorney for related matters that arise out of their relationship not covered by their contingency fee contract. This may include any amounts collected for the plaintiff by the attorney." The Fee Agreement did not contain a "related matters" statement. In our most recent decision (this is the third appeal in this case), we concluded § 6147(a)(3) did not require a "related matters" statement when in fact there are no related matters arising out of the attorney-client relationship not covered by the parties' contingency fee agreement. *See Alioto v. Hoiles*, 341 F. App'x 433, 441 (10th Cir. 2009). However, because the parties disputed whether related matters existed, we remanded to the district court to decide the issue in the first instance. *Id.* at 441-42.

The district court identified at least one related matter and therefore determined the absence of a "related matters" statement in the Fee Agreement rendered it voidable at Hoiles's option. *See* Cal. Bus. & Prof. Code § 6147(b) ("Failure to comply with any provision of [§ 6147(a)] renders the agreement voidable at the option of the plaintiff, and the attorney shall thereupon be entitled to collect a reasonable fee."). We agree there was a related matter (but not the one identified by the district court) and thus the Agreement was voidable. We also agree Hoiles did not ratify the Agreement prior to voiding it. The jury's quantum meruit verdict was correctly reinstated.

# I. BACKGROUND

The historical and procedural facts are well known to the parties and have been reported in prior decisions of this Court and the district court.[1] We repeat them only as necessary and then only briefly.

In 2001, Hoiles, his ex-wife, and two daughters owned 667,361.50 shares of stock in Freedom Communications, Inc., a closely-held California media corporation started by Hoiles's grandfather. (We will refer to shares owned by the ex-wife and daughters as the "Family Shares.") Hoiles decided he wanted out of Freedom with the ability to sell his shares for a fair price (market value).[2] To that end, Holies sought out Alioto to represent him and specifically requested the representation be on a contingency fee basis. The two entered into a simple contingency fee agreement, which reads:

RE: Freedom Communications

Dear Tim,

This letter sets forth the bases upon which my firm will represent you in the Freedom Communications matter.

---

[1] *See Alioto*, 341 F. App'x at 434-37; *Hoiles v. Alioto*, 461 F.3d 1224 (10th Cir. 2006); *Alioto v. Hoiles*, No. 04-CV-438-CMA-MEH, 2010 WL 3777129 (D. Colo. Sept. 21, 2010) (unpublished); *Alioto v. Hoiles*, 488 F. Supp. 2d 1148 (D. Colo. 2007); *Alioto v. Hoiles*, No. 04–CV–438–JLK–MEH, 2007 WL 4557838 (D. Colo. Dec. 20, 2007) (unpublished); *Alioto v. Hoiles*, No. 04–CV–438–JLK–MEH, 2007 WL 2572414 (D. Colo. Sept. 6, 2007) (unpublished); *Alioto v. Hoiles*, No. 04–CV–438–JLK–MEH, 2007 WL 2298310 (D. Colo. Aug. 7, 2007) (unpublished); *Hoiles v. Alioto*, 345 F. Supp. 2d 1178 (D. Colo. 2004).

[2] There was no public market for the shares and Freedom shareholders were unwilling to purchase Hoiles's shares for more than their gift and estate tax value (less than $50 per share).

1. A $500,000 non-deductible non-refundable retainer, which has already been paid.

2. Fifteen percent (15%) of anything recovered before the filing of a complaint; 20% of anything recovered after the filing of a complaint but before the commencement of the trial; and 25% of anything recovered after the commencement of the trial. (As I said at our meeting, these percentages are lower than my customary charges because some of the recovery will necessarily include ownership that you already have.)

3. The reimbursement of out-of-pocket expenses, which include such items as transcripts, depositions, first-class travel and accommodation, photocopying, telephone, Westlaw time, etc. In connection with these costs, you have already advanced $100,000 which will be deposited in a cost fund account for your benefit, and which will be used to finance the costs as they are incurred. We shall send you a monthly statement of the costs drawn from the account. You agree to maintain this cost fund at a level of $50,000. At the conclusion of the case, anything remaining in the cost fund will, of course, be returned to you.

4. I shall be allowed to hire counsel to assist me in the prosecution of the case. Any additional counsel will not increase the amount of your fee, however, costs may be proportionately greater.

5. If you withdraw from or dismiss the case against my recommendation, you will pay a reasonable attorney fee based upon $1,000 an hour for my time and $500 an hour for the time of my co-counsel.

6. The retainer, expert fees and costs used in the prosecution of the case will not be deducted from any recovery before the application of the contingency in Paragraph 2.

7. Any expert hired in this case will be paid directly by you. However, I will choose the expert and negotiate a fee on your behalf.

8. You have the sole authority to settle the case on your behalf. However, you will not unreasonably withhold your consent to settle the case on my recommendation. If you unreasonably withhold your consent to settle the case for an amount I believe to be reasonable in all of the circumstances, I shall be allowed to withdraw from the case and paid in accordance with Paragraph 5.

I am obliged to state that this agreement is by negotiation and not otherwise set or established by law, and that I am self-insured.

If you agree to the terms of this retainer, please sign in the lower left-hand space provided for your signature, retain a copy of this agreement for your files, and return the original to me.

It will be an honor and privilege to represent you in this important litigation.

(Joint App'x Vol. I at 85-88.)

Over the next two and a half years a "carrot and stick"[3] strategy was employed to attain Hoiles's goal of achieving liquidity for his shares. It was devised and implemented by Alioto and the "posse."[4] The "carrot" involved educating the shareholders as to the true value of their stock if it could be more freely traded. The "stick" was a complaint against certain shareholders alleging a violation of California's antitrust law and breach of fiduciary duty. Alioto sent a copy of the draft complaint to all shareholders; Hoiles frequently threatened to file it should the shareholders continue to thwart his desire to be bought out at a fair price.

The strategy met with some success—Freedom offered to purchase Hoiles's shares for $100 per share, the highest offer ever received by a shareholder. Hoiles rejected the offer and further negotiations eventually broke down. Nevertheless, in October 2002, Freedom's Board created a Special Committee to evaluate options for providing liquidity for Freedom shares, including a sale or merger of the company and recapitalization.

---

[3] The "carrot and stick" metaphor is "characterized by the use of both reward [the carrot] and punishment [the stick] to induce cooperation." *See* http://www.merriam-webster.com/dictionary/carrot-and-stick.

[4] Alioto assembled a team of attorneys and experts to assist him in the matter; these attorneys and experts were collectively referred to as the "posse." (Joint App'x Vol. III at 946.)

Ultimately, the Committee recommended a recapitalization proposal from two private investment firms which would allow shareholders, like Hoiles, who wished to liquidate their shares to redeem them at $212.71 per share. The shareholders voted in favor of the proposal in December 2003 and the recapitalization closed in May 2004. Hoiles, his ex-wife, and daughters elected to redeem their shares, collectively obtaining a total of approximately $142 million.

In January 2004, Alioto demanded from Hoiles $28.4 million in attorneys' fees, which represented 20% of the amount realized on the redemption of Hoiles's shares as well as the Family Shares. The Fee Agreement called for only 15% of anything recovered before a complaint was filed and a complaint (while threatened) was never filed. Alioto justified his demand for 20% based on an oral amendment to the Fee Agreement. Alioto claimed Hoiles orally agreed to pay him 20% in order to remove any incentive Alioto may have had to prematurely file a complaint, to adequately compensate Alioto for his extensive work and as a reward for the extraordinary results he had achieved. Alioto also claimed Hoiles had agreed to increase the percentage because Hoiles had changed the scope of the representation—Alioto was expected to secure a competitive price not only for his shares and the Family Shares but also for other shareholders who might want liquidity.[5]

---

[5] Alioto has not sought to recover 20% under the contract in this lawsuit; his breach of contract claim only seeks 15%. He contends he only made the pre-litigation demand as a "matter of honor," expecting Hoiles to stand by his word. (Joint App'x Vol. III at 909; Vol. VI at 1893.) However, it appears he seeks 20% under his unjust

(continued . . .)

- 6 -

On January 21, 2004, Hoiles sent a letter to Alioto instructing him "to take no further actions as a lawyer on [his] behalf" and to submit a billing statement for his legal services at $1,000 per hour and for co-counsel's services at $500 per hour. (Joint App'x Vol. I at 381.) He further informed Alioto he had retained independent counsel to "deal with your demands and my rights." (*Id.*)

Unable to resolve their differences, Hoiles and Alioto filed separate lawsuits against each other—Hoiles in Colorado state court, Alioto in California state court. Both cases were removed to federal court and Alioto's case was eventually transferred to Colorado and consolidated with Hoiles's. The district court originally concluded the Fee Agreement was invalid under Colorado law. The case proceeded to a jury trial on a quantum meruit theory; the jury found in favor of Alioto and awarded him $1.15 million, which the district court reduced to a judgment of $650,000 after deducting the $500,000 non-refundable retainer already paid. We reversed, concluding California, not Colorado, law applied. *See Hoiles v. Alioto*, 461 F.3d 1224, 1238 (10th Cir. 2006).

On remand, the district court concluded the Fee Agreement was voidable under California law because it failed to comply with § 6147(a)(3) of the California Business and Professions Code. *See Alioto v. Hoiles*, 488 F. Supp. 2d 1148, 1151-52 (D. Colo. 2007). It wrote "[u]nder the plain language of [§ 6147(a)(3)], some sort of statement

---

enrichment (quantum meruit) claim. While his complaint seeks only 15% on the quantum meruit claim, in his response to interrogatories, Alioto claimed he was entitled to 20% on the quantum meruit claim. It is unclear from the record before us whether he sought 20% at trial on the quantum meruit claim.

about related matters is required, even if it is a statement that there are *no* related matters not covered by the agreement for which the client could be required to pay compensation." *Id.* at 1151-52. Because the Fee Agreement contained no such statement, the court decided it was voidable by Hoiles under § 6147(b), Hoiles had exercised his statutory right to void it, and Hoiles had not ratified the defective agreement prior to voiding it. *Id.* at 1152-53; *Alioto v. Hoiles*, No. 04-CV-00438-JLK-MEH, at 8-13 (D. Colo. Dec. 21, 2007). As a result, it reinstated the jury's previous quantum meruit verdict. *Alioto*, 488 F. Supp. 2d at 1157; *Alioto*, No. 04-CV-00438-JLK-MEH, at 13.

We again reversed, holding: "§ 6147(a)(3) requires no related matters statement if there are no related matters." *Alioto*, 341 F. App'x at 441. However, because the parties differed as to the existence of related matters, we remanded for the district court to decide the issue. *Id.* at 441-42. We also recognized existing disputes as to (1) whether the Fee Agreement violated other provisions of California law and (2) the proper interpretation of the Fee Agreement. *Id.* We decided these issues would also be best addressed by the district court in the first instance. *Id.* at 442.

On remand, the district court first determined the Fee Agreement was unambiguous and provided only for Alioto's representation of Hoiles regarding his shares and not the Family Shares (as Alioto had alleged). It went on. Even assuming the Fee Agreement was ambiguous, making extrinsic evidence relevant, it concluded the evidence did not support Alioto's claim to having been hired to represent Hoiles's ex-wife and daughters. That is because there was no evidence showing Hoiles was authorized to act on their behalf. It then turned to whether Alioto sought fees for related

- 8 -

matters not covered by the Fee Agreement. It determined Alioto's attempt to collect 20% rather than 15% from Hoiles after his role expanded from seeking a fair price for Hoiles to seeking a fair price for him and all other Freedom shareholders constituted a related matter.[6] Therefore, because Alioto attempted to collect fees for at least one related matter and the Fee Agreement did not contain a related matters statement as required by § 6147(a)(3), the district court determined the Agreement was voidable at Hoiles's option. The court further concluded Hoiles had voided the Agreement and he had not ratified it prior to voiding it. The court reinstated the jury's quantum meruit verdict.

## II. DISCUSSION

The issues raised in this appeal were decided by the district court on the parties' cross-motions for summary judgment. Our review is de novo. *Sanders v. Sw. Bell Tele., L.P.*, 544 F.3d 1101, 1104 (10th Cir. 2008).

A.      Related Matters under § 6147(a)(3)

The district court decided Alioto's attempt to collect 20% from Hoiles based on an alleged oral modification of the Fee Agreement (the 20% Issue) is a "related matter . . . aris[ing] out of [the parties'] relationship not covered by their contingency fee contract." Cal. Bus. & Prof. Code § 6147(a)(3). Hoiles agrees but also identifies two other related

---

[6] After Hoiles received the 20% demand from Alioto, Joseph Barletta (Hoiles's business consultant and lawyer) wrote Alioto disclaiming any oral modification was made. Hoiles himself did not expressly respond to Alioto's allegation an oral modification was made. The district court did not resolve the factual dispute; it simply accepted Alioto's version of events.

matters, including Alioto's attempt to seek additional compensation for the legal services he performed for Hoiles's ex-wife and daughters (the Family Shares Issue). While we agree with the district court a "related matter" exists, we decide the question based on the Family Shares Issue rather than the 20% Issue.

The rules of statutory construction are clear:

> As in any case involving statutory interpretation, our fundamental task is to determine the Legislature's intent so as to effectuate the law's purpose. Statutory interpretation begins with an analysis of the statutory language. If the statute's text evinces an unmistakable plain meaning, we need go no further. If the statute's language is ambiguous, we examine additional sources of information to determine the Legislature's intent in drafting the statute.

*Olson v. Auto. Club of S. Cal.*, 179 P.3d 882, 884 (Cal. 2008) (citations and quotation marks omitted).

As always, we start with the words of the statute. Section 6147(a)(3) requires "[a] statement as to what extent, if any, the client could be required to pay any compensation to the attorney for related matters that arise out of their relationship not covered by their contingency fee contract." Breaking the statutory language into elements aids understanding. The statute is violated when an attorney (1) requires (or attempts to require) payment from the client; (2) for a related matter; (3) arising out of their relationship; (4) and the matter is not covered by (disclosed in) the fee agreement.

Turning to the last element first, the parties dispute whether the Fee Agreement covered the Family Shares—Alioto saying yes, Hoiles saying no. The basic goal of contract interpretation is to give effect to the parties' mutual intent at the time of contracting. *MacKinnon v. Truck Ins. Exch.*, 73 P.3d 1205, 1212-13 (Cal. 2003). "Such intent is to be inferred, if possible, solely from the written provisions of the contract. The

- 10 -

clear and explicit meaning of these provisions, interpreted in their ordinary and popular sense, unless used by the parties in a technical sense or a special meaning is given to them by usage, controls judicial interpretation." *Id.* at 1213 (citations and quotation marks omitted). A contract provision is ambiguous when it is capable of two or more reasonable constructions. *Id.* If a contract is ambiguous, extrinsic evidence is admissible to resolve the ambiguity. *WYDA Assocs. v. Merner*, 50 Cal. Rptr. 2d 323, 327 (Cal. Ct. App. 1996).

Because the contract at issue is an attorney-fee agreement, additional rules apply. Attorney fee agreements are to be "strictly construed against the attorney."[7] *Alderman v. Hamilton*, 252 Cal. Rptr. 845, 848 (Cal. Ct. App. 1988). If any ambiguity exists, the construction favoring the client controls. *See Lane v. Wilkins*, 40 Cal. Rptr. 309, 315 (Cal. Dist. Ct. App. 1964) ("The general rule is that in construing contracts between attorneys and clients concerning compensation if there is any ambiguity as to the intent of the parties that construction should be adopted which is most favorable to the client.") (quotation marks omitted).

The district court concluded the Fee Agreement was not ambiguous and did not cover the Family Shares. It reasoned the Agreement is addressed only to Hoiles, is replete with singular references of "you" and "your shares," and only required Hoiles's signature. "Nothing on the face of the Contingency Fee Agreement even hints at the

---

[7] Not only are fee contracts construed against the attorney, ambiguous contracts in general are construed against their drafters—again, Alioto. *Zipusch v. LA Workout, Inc.*, 66 Cal. Rptr. 3d 704, 709 (Cal. Ct. App. 2007).

prospect that Alioto also is representing Hoiles' ex-wife and two adult daughters." (Joint App'x Vol. VI at 2151.) Even assuming the Agreement could be deemed ambiguous and extrinsic evidence examined, the court found the evidence did not support Alioto's claim he was retained to represent not only Hoiles but also his ex-wife and daughters, namely, there was no evidence Hoiles was authorized to act on their behalf. For the reasons given by the district court, we agree the Fee Agreement did not cover the Family shares.[8]

Given that the Family Shares Issue is not covered by the Agreement, the question becomes whether the issue involves Alioto seeking compensation from Hoiles for a "related matter" arising out of their attorney-client relationship. The statute does not define "related matter." And there are no California cases specifically defining it in relation to § 6147. Therefore, we are left with the difficult task of determining how the California courts would define the term. *See Parish Oil Co. v. Dillon Cos.*, 523 F.3d 1244, 1248 (10th Cir. 2008). The district court looked to a California Supreme Court case involving insurance coverage in which the court defined the term "related" as "'standing in relation; connected; allied; akin'" and having "'a causal connection as well

_____

[8] Alioto points to (1) numerous letters and newspaper articles in which Hoiles demands a fair price for the Family Shares or otherwise indicates he is representing the interests of his ex-wife and daughters; (2) the draft complaint which references the Family Shares and which Hoiles approved (indeed he clarified the number of shares owned by him and his ex-wife and daughters for purposes of the complaint);(3) the documents Hoiles's accountants prepared regarding the amount of fees owed to Alioto; these documents calculate Alioto's fee based on the amount realized by the Family Shares as a result of the recapitalization; and (4) Hoiles's letter to his ex-wife and daughters seeking assistance in paying Alioto's fees and attaching the documents prepared by his accountants. Hoiles says he told Alioto the references to the Family Shares in the complaint, letters and newspaper articles were incorrect and only asked his accountants to determine Alioto's fee based on his shares alone. We need not resolve this factual dispute. The fact remains Alioto never drafted the Fee Agreement to cover the Family Shares. And he admitted the Fee Agreement does not say he is representing Hoiles and his ex-wife and daughters or a specific percentage of shares.

as the notion of similarity.'" (Joint App'x Vol. VI at 2154 (quoting *Bay Cities Paving & Grading v. Lawyers' Mutual Ins. Co.*, 5 Cal. 4th 854, 868 (Cal. 1993) (quotation marks omitted.)) We agree with these definitions as they are consistent with the plain meaning of "related." *See* http://www.oed.com/view/Entry/161808?redirectedFrom=related#eid (defining "related" as, among other things, "[c]onnected or having relation to something else"). But that only tells part of the story. The other key word is "matter." It means "[a] thing, affair, concern" and "[a]n event, circumstance, fact, question, state or course of things, etc., which is or may be an object of consideration or practical concern; a subject, an affair, a business." *See*

http://www.oed.com/view/Entry/115083?rskey=we80Mo&result=1&isAdvanced=false#eid.

While the plain mean of the term "matter" is broad, placed in the context of the rest of § 6147(a)(3), a "matter" must be one for which the attorney can be compensated. *See* Cal. Bus. & Prof. Code § 6147(a)(3) (requiring "[a] statement as to what extent, if any, the client *could be required to pay any compensation to the attorney for related matters* that arise out of their relationship not covered by their contingency fee contract") (emphasis added). This compensation requirement, in the context of an attorney's fee statute, contemplates the provision of legal services. Thus, a "matter" must be some form of legal service.[9]

---

[9] Our conclusion is supported by the issues the California Court of Appeals has found to be "related matters"—an attorney's efforts to collect on a judgment and an attorney's post-settlement work. *See Shumake v. Schwam*, No. B199587, 2008 WL 4458164, at *5 (Cal. Ct. App. Oct. 6, 2008) (unpublished) (time spent collecting the judgment); *Tishgart v. DeJesus*, No. A104244, 2004 WL 1941193, at *3 (Cal. Ct. App. Aug. 31, 2004) (unpublished) (post-settlement work). Both involve legal services for which an attorney can be compensated.

The Family Shares Issue is a "matter" because it involves Alioto's provision of legal services to obtain a fair price for the Family Shares and Alioto seeks to be compensated for those legal services—he seeks 15% of the amount realized by Hoiles's ex-wife and daughters as a result of the recapitalization. And those legal services are "related" to the legal services Alioto agreed to provide Hoiles—to obtain a fair price for Hoiles's shares. Indeed, Alioto has admitted by his conduct that the Family Shares Issue is "related" to his representation of Hoiles. And his conduct speaks volumes.

Alioto has always claimed the Fee Agreement and his legal services covered the Family Shares, not just Hoiles's shares. Unfortunately for him, the Fee Agreement cannot be interpreted to cover the Family Shares. Additionally, from the beginning of his representation of Hoiles, he performed legal services to obtain not only a fair price for Hoiles's shares but the Family Shares as well. Indeed, the draft complaint references the Family Shares and numerous letters were sent by Hoiles at Alioto's direction to Freedom shareholders demanding a fair price not only for Hoiles's shares but the Family Shares as well. The draft complaint also references the Family Shares. He cannot now claim the services he performed for the Family Shares were unrelated to those he performed for Hoiles. Indeed, they were part and parcel of his representation of Hoiles.

Alioto's arguments to the contrary do not pass muster. He claims the Family Shares Issue is a contract interpretation issue, not a "related matter." He relies on *Drummond v. Temmerman, Desmarais & Phillips, LLP*, claiming the legislature did not intend for § 6147 to invalidate all contingent fee agreements found to be ambiguous or to involve a disagreement between a lawyer and his client. No. H030601, 2009 WL 1611281 (Cal. Ct. App. June 10, 2009) (unpublished). But *Drummond* is not helpful. There, the clients argued that because a term of their fee agreement with the attorney was ambiguous, the term was not "included" as required by § 6147. *Id.* at *6. The court

simply held, unremarkably, that not all ambiguous fee contracts are voidable under § 6147. Here, it is not any ambiguity in the Fee Agreement which makes it voidable under § 6147. Rather, it is the fact it does not cover the Family Shares, whether ambiguous or not, yet Alioto seeks compensation for the services he performed pertaining to those shares.

Alioto also says Hoiles testified he understood he retained Alioto to seek a fair price for his and the Family Shares. Alioto is flatly wrong and the record citations he points to do not support this proposition. Hoiles consistently testified his purpose in hiring Alioto was to secure a fair price for <u>his</u> shares.[10]

Our conclusion is in line with the purpose of § 6147(a), which is to protect clients by ensuring contingency fee agreements are fair and understandable. *Alderman v. Hamilton*, 252 Cal. Rptr. 845, 848 (Cal. Ct. App. 1988). Alioto, as the attorney and the drafter of the Fee Agreement, could have drafted the Fee Agreement to explicitly state his representation covered the Family Shares, not just Hoiles's. *See supra* n.10. He did not.

Alioto tried to collect fees from Hoiles on a matter related to the Fee Agreement. Because the Agreement lacked a related matters statement, it is voidable under § 6147.

---

[10] Several of the record citations are to Alioto's testimony and his understanding of the Fee Agreement. Others relate to the agreement Hoiles signed with media broker, Christopher Shaw. In that agreement, Shaw agreed to assist Hoiles "in securing the maximum value for the shares . . . held by yourself and your immediate family . . . in Freedom Communications Inc (a total equity interest of 667,000 shares or approximately 8.5%)." (Jt. App'x Vol. III at 1038.) The Shaw agreement is a prime example of how Alioto could have drafted the Fee Agreement to cover the Family Shares.

B.    Ratification

The district court determined Hoiles voided the Fee Agreement on January 21,

2004, when he directed Alioto to take no further action as his lawyer and offered to pay

him an hourly fee for his services.  As to whether he ratified the Agreement prior to

voiding it, the court concluded ratification required Hoiles to have had full knowledge of

his right to void the Agreement and there was no evidence he had such personal

knowledge or that any of his attorneys informed him of his avoidance rights.  It further

concluded there was no support in California law for Alioto's argument that an attorney's

knowledge may be imputed to his client for purposes of ratification.[11]

Alioto does not contest the date Hoiles voided the Fee Agreement, January 21, 2008.

He does, however, disagree that Hoiles did not ratify the Agreement prior to that date.

If a contingency fee agreement does not comply with § 6147, the agreement "is

voidable at the option of the plaintiff . . . ."  *See* Cal. Bus. & Prof. Code § 6147(b); *see also*

*Alderman,* 252 Cal. Rptr. at 848 (if a contingency fee agreement does not comply with §

---

[11] The district court also looked to Hoiles's actions after January 21, 2004, to determine whether he ratified the Fee Agreement.  But once a party exercises his right to void an agreement or contract, it cannot thereafter be ratified.  *See In re Estate of Molino*, 81 Cal. Rptr. 3d 512, 520 (Cal. Ct. App. 2008).  Thus, the court's analysis as to Hoiles's actions after that date is legally flawed.  Alioto may have contributed to any confusion on the point.  In his district court briefs, he labeled his arguments regarding ratification as (1) Hoiles's election to proceed with the Fee Agreement in March 2002 after consulting with three attorneys constituted ratification and (2) Hoiles ratified the Fee Agreement after January 21, 2004.  Despite the second label, Alioto did not invite error.  The content of that argument clearly shows Alioto was contesting the previous judge's finding that Hoiles had voided the Fee Agreement on January 21, 2004, pointing to letters Hoiles wrote after that date to demonstrate he had not terminated Alioto as his attorney in January.  In any event, the parties do not urge an erroneous argument on appeal.  Both parties look to Hoiles's actions and knowledge prior to January 21, 2004, in arguing their respective positions.

6147, the client has an "absolute right to void the contract before or after services [are] performed"). However, in general, a voidable contract may be ratified. *Fergus v. Songer*, 59 Cal. Rptr. 3d 273, 288-89 (Cal. Ct. App. 2007) (assuming contingency fee agreement voidable under § 6147 can be ratified). Nevertheless, in order for a voidable contract to be ratified, the client must have actual knowledge of his right to void the agreement. *Id*. at 289; *see also Brown v. Rouse*, 38 P. 507, 508-09 (Cal. 1894) ("[I]t is an inherent element of ratification that the party to be charged with it must have fully known what he was doing . . . . [T]he very essence . . . of . . . ratification is that it is done advisedly, with full knowledge of the party's rights.") (quotation marks omitted).[12]

There is no evidence that prior to January 21, 2004, Hoiles personally knew he had the right to void the Agreement or that his attorneys informed him of this right. Recognizing this, Alioto claims Hoiles did not personally need to know of his right to avoid the Agreement. It is enough, he says, that Hoiles consulted with three attorneys prior to signing the Agreement and these attorneys are presumed to know the law, including voidability under § 6147. He maintains California law allows the attorneys' presumed knowledge to be imputed to Hoiles. In other words, Hoiles is charged with knowing everything his attorneys should have known.

"The general rule of agency is that notice to or knowledge possessed by an agent is imputable to the principal. This rule ordinarily applies in the relation of attorney and client." *Chapman Coll. v. Wagener*, 291 P.2d 445, 448 (Cal. 1955) (citation omitted).

---

[12] Neither party disputes California law applies to this issue.

- 17 -

As against a principal, both principal and agent are deemed to have notice of whatever either has notice of, and ought, in good faith and the exercise of ordinary care and diligence, to communicate to the other . . . . The fact that the knowledge acquired by the agent was not actually communicated to the principal . . . does not prevent operation of the rule. The knowledge is, in law, imputed to the principal. The agent may have been guilty of a breach of duty to his principal, yet the knowledge has the same effect as to third persons as though his duty had been faithfully performed. The agent acting within the scope of his authority, is, as to the matters existing therein during the course of the agency, the principal himself.

*McIntosh v. Mills*, 17 Cal. Rptr. 3d 66, 78 (Cal. Ct. App. 2004) (quotation marks and emphasis omitted); *see also Herman v. Los Angeles Cty. Metro. Transp. Auth.*, 84 Cal. Rptr. 2d 144, 150 (Cal. Ct. App. 1999) (stating an agent/attorney's knowledge is imputed to the principal/client even if the agent/attorney fails to communicate that knowledge to the principal/client but noting this legal proposition does not apply when the principal/client must have actual knowledge); *People v. Amerson*, 198 Cal. Rptr. 678, 681 (Cal. Ct. App. 1984) ("It is axiomatic that knowledge to the attorney is knowledge to the client.").

However, in all but two of the cases cited by Alioto,[13] as well as in those cases this Court found in which the court imputed an attorney's knowledge to his client, the attorney

---

[13] In *Amerson*, Amerson argued the sentencing court was required to *sua sponte* inform him of a California statute allowing those, like him, who served in combat in Vietnam and suffered from substance abuse or psychological problems as a result, to serve his state sentence in federal custody. 198 Cal. Rptr. at 680. The California Court of Appeals rejected the argument. *Id.* at 680-81. It then found Amerson had knowingly waived his rights under the statute by failing to raise them at sentencing—"[p]resumably, defense counsel performed his duty as an attorney and adequately informed [him] of his legal rights. It is axiomatic that knowledge to the attorney is knowledge to the client." *Id.* at 681 (citation omitted). It is unclear whether the attorney had actual knowledge of the statute or whether the court presumed the attorney did and imputed it on *Amerson*.

(continued . . .)

- 18 -

had actual knowledge of the relevant facts. *See, e.g., Chapman Coll.*, 291 P.2d at 448 (imputing attorney's knowledge of provisions of promissory notes, which he helped draft, to client); *Gracey v. Tilles, Webb, Kulla & Grant*, No. B234634, 2013 WL 672724, at *5-6 (Cal. Ct. App. Feb. 25, 2013) (unpublished) (imputing attorney's actual knowledge of voidability of fee agreement to clients); *McIntosh*, 17 Cal. Rptr. 3d at 71, 78 (imputing attorney's actual knowledge of illegality of contract to client); *Bennett v. Shahhal*, 89 Cal. Rptr. 2d 272, 276 n.3 (Cal. Ct. App. 1999) (rejecting argument client did not know his attorney had sent first notice of intent to sue to defendant because attorney's knowledge is imputed to client); *Stalberg v. W. Title Ins. Co.*, 282 Cal. Rptr. 43, 48-49 (Cal. Ct. App. 1991) (imputing plaintiffs' law firm's discovery that defendant authored the wild deeds to plaintiffs in determining when plaintiffs learned of their "slander of title" claim for purposes of the statute of limitations). Here, there is no evidence any of Hoiles's attorneys actually knew the Fee Agreement was voidable under § 6147 or that it was an issue they would reasonably be expected to address under the circumstances. Indeed, their testimony, which Alioto has not rebutted, was that none of them reviewed the Agreement prior to Hoiles signing it. And Hoiles's testimony, which has also not been rebutted, reveals he never received any advice from any of these attorneys concerning the Agreement.

---

In *Watson v. Sutro*, the court found an attorney's reading of a deed provided constructive notice to his client of the deed's defects. 86 Cal. 500, 524  25 P. 64 (Cal. 1890). Again, it is unclear whether the attorney had actual knowledge of the defects upon reading the deed (the court did say the defects were on the face of the deed). Nevertheless, the attorney did read the deed. In this case, none of the attorneys reviewed the Fee Agreement.

- 19 -

Alioto nevertheless argues attorneys are presumed to know the law and therefore Hoiles's attorneys are presumed to have known the Fee Agreement was voidable under California law. And, according to Alioto, this presumption of knowledge can be imputed to Hoiles. But we have uncovered no California case law or even cases from other jurisdictions (and Alioto cites none) supporting his argument in the context of ratification. Indeed, a California Court of Appeals case suggests otherwise. *See Gallagher v. Cal. Pac. Title & Trust Co.*, 57 P.2d 195, 201 (Cal. Dist. Ct. App. 1936) ("The doctrine of constructive knowledge of material facts or imputation of knowledge of such facts does not generally obtain in the case of ratification, as ordinarily it is what the principal knows, and not what he has mere legal notice of, that is to be considered in determining whether there has been ratification.").[14]

Hoiles did not ratify the Fee Agreement prior to voiding it.

C.    Reinstatement of Jury's Quantum Meruit Verdict

Alioto's quantum meruit claim was initially tried to the jury based on Colorado law which did not allow the jury to consider the void Fee Agreement's fee percentage or the work of co-counsel in determining a reasonable fee.[15] On the most recent remand, the district court decided California law applied to the quantum meruit claim but rejected

---

[14] Alioto says *Gallagher* is distinguishable because the agent's actions were not authorized and thus its holding was simply that a principal's knowledge of *unauthorized* acts is generally not imputed. But in setting forth the general rule that imputation of an agent's knowledge does not generally apply to give the principle full knowledge for purposes of ratification, the court did not rely on the fact the agent's actions were unauthorized. *Gallagher*, 57 P.2d at 201.

[15] Alioto hired three attorneys to assist him in representing Hoiles; he agreed to pay these attorneys a percentage of the amount he received from Hoiles.

Alioto's argument for a new trial allowing the jury to be instructed on California law. It determined California law, like Colorado law, precluded consideration of a fee percentage contained in a void contingency fee agreement in a quantum meruit case. It further concluded Alioto did not have standing to recover fees in quantum meruit on behalf of co-counsel, who are not parties to this action.

Neither party contests application of California law to this issue. Alioto, however, argues California law allows jury consideration of the fee percentage in a void contingency fee contract and co-counsels' services in determining a reasonable fee.

1.      Contingency Fee Percentage

The California Supreme Court has yet to address whether a jury may consider a void contingency fee agreement in determining a reasonable attorney fee under § 6147(b). However, the California Court of Appeals has said no:

> Where, as here, a client exercises his right to void a contingency fee agreement, [§] 6147 does not permit the trier of fact to consider the contingent nature of the fee arrangement in determining a reasonable fee. If the contingency fee agreement is void, there is no contingency fee arrangement. A void contract is no contract at all; it binds no one and is a mere nullity. Consequently, such a contract cannot be enforced.
>
> The deterrent and protective purposes of [§] 6147 would be impaired if an attorney who was barred from enforcing a contingency fee agreement would nevertheless be entitled to a percentage of the recovery based on the contingent risk factor. The attorney would in effect be receiving a contingency fee even though the contingency fee agreement had been voided by the client.

*Fergus*, 59 Cal. Rptr. 3d at 290 (citation and quotation marks omitted);[16] *see also Siciliano v. Singh*, Nos. E052352 & E053582, 2012 WL 4748862, at \*7 (Cal. Ct. App. Oct. 5, 2012)

---

[16] In determining how a state court would rule on an issue, we normally look to the most recent decisions of the state's highest court. "Where the state's highest court has

(continued . . .)

- 21 -

(unpublished) ("[I]t would be anomalous to allow a client to void a contract on the basis it did not comply with [§] 6147 but to nonetheless allow the attorney who drafted the contract to obtain enforcement of terms favorable to himself."); *Zweig v. Kwon*, No. B153064, 2003 WL 150107, at *7 (Cal. Ct. App. Jan. 22, 2003) (unpublished) ("To provide a remedy that compensates an attorney who violates [§] 6147 at the same rate that the invalid, unenforceable contract would have provided would make [§] 6147 meaningless and would frustrate the public policy it expresses."); *Mesa West, Inc. v. LaMoure*, No. G038601, 2009 WL 388992, at *13 (Cal. Ct. App. 2009) (unpublished) (trial court properly ignored the general rule that a regularly hourly rate does not fairly compensate an attorney hired on a contingent fee basis; because the contingency fee agreement was voided by the client for failing to comply with § 6147, "this is no longer a contingency fee case").[17]

---

not addressed the issue, we . . . follow the state's intermediate court decisions absent convincing evidence that the highest court would decide otherwise." *See Commonwealth Prop. Advocates, LLC v. Mortg. Elec. Registration Sys., Inc.*, 680 F.3d 1194, 1204 (10th Cir. 2011) (quotation marks omitted).

[17] Alioto says *Fergus* was wrongly decided in light of previous California cases. He cites a Ninth Circuit case, *In re Pac. Far E. Line, Inc.*, 654 F.2d 664 (9th Cir. 1981), and a case from the Central District of California, *Herbold v. Millard*, No. CV-02-1639 (C.D. Cal. Aug. 6, 2004). The Ninth Circuit case is not helpful. There, the contingency fee agreement was held unenforceable due to the client's bankruptcy. The bankruptcy court nevertheless determined a reasonable attorney's fee under federal bankruptcy standards was $1.5 million, which was the amount the attorney (who happened to be Alioto) would have earned under the contingency fee agreement. 654 F.2d at 670 & n.8. The Ninth Circuit suggested this was error as the reasonableness of the fee should have been determined under state law standards. *Id.* at 670. In any event, because the attorney had not challenged the reasonableness of the fee, it concluded it need not decide the issue. *Id. Herbold* is more on point as it at least involved a contingent fee agreement held to be unenforceable because it violated § 6147. However, it was decided prior to *Fergus*.

(continued . . .)

- 22 -

While not directly on point, *Chambers v. Kay* supports this conclusion.  56 P.3d 645 (Cal. 2002).  There, Chambers and Kay were two attorneys who operated separate law practices.  Kay initiated representation of a plaintiff in a sexual harassment action.  At Kay's request, but without the plaintiff's written consent, Chambers began serving as co-counsel.  During the course of the sexual harassment action, Chambers was discharged by Kay.  Kay informed Chambers he would be entitled to 16% of Kay's attorneys' fees, which were 40% of the plaintiff's recovery.  The sexual harassment action eventually resulted in a substantial jury verdict for the plaintiff and an award of attorneys' fees.  Kay then informed Chambers

---

The other cases cited by Alioto are not helpful.  Only two involved contingency fee agreements and all precede *Fergus*.  *LuMetta v. U.S. Robotics, Inc.*, 824 F.2d 768, 770 (9th Cir. 1987) (commission contract); *Joost v. Sullivan*, 111 Cal. 286, 296, 43 P. 896 (Cal. 1896) (construction contract); *Watson v. Wood Dimension, Inc.*, 209 Cal. App. 3d 1359, 1365, 257 Cal. Rptr. 816 (Cal. Ct. App. 1989) (commission contract); *George v. Double-D Foods, Inc.*, 155 Cal. App. 3d 36, 42, 201 Cal. Rptr. 870 (Cal. Ct. App. 1984) (employment contract); *Ferrier v. Commercial Steel Corp.*, 142 Cal. App. 2d 424, 426-27, 289 P.2d 555 (Cal. Dist. Ct. App. 1956) (service contract); *Offeman v. Robertson-Cole Studios, Inc.*, 80 Cal. App. 1, 13, 251 P. 830 (Cal. Dist. Ct. App. 1926) (employment contract).  The two cases that do involve contingency fee agreements are distinguishable.  In *Cazares v. Saenz,* 256 Cal. Rptr. 209, 212-15, at *4 (Cal. Ct. App. 1989), the fee agreement was unenforceable due to impossibility (the attorney became a judge); in *Donfeld, Kelly & Rollman v. Bass*, it was unenforceable due to the client discharging the attorney.  Nos. B150938 &  B152772, 2002 WL 31160867, *4-6 (Cal. Ct. App. Sept. 30, 2002) (unpublished).  Here, the Fee Agreement is void.  The distinction is material, because as *Fergus* points out, allowing a jury to consider a contingency fee percentage void under § 6147 would frustrate the statute's purpose.

Alioto claims that should we reach the question of whether *Fergus* misapplied settled California law, we should exercise our discretion and certify the question to the California Supreme Court.  He did not request certification in the district court because doing so would have been futile.  California's certification rules allow for certification only upon request of "the United States Supreme Court, a United States Court of Appeals, or the court of last resort of any state, territory, or commonwealth."  *See* California Rules of Court, Rule 8.548(a).  In any event, certification is not necessary.

- 23 -

he would not be receiving 16% of Kay's fees but rather would be paid an hourly rate.

Chambers objected and filed suit for breach of contract. The California Supreme Court held

Chambers and Kay's fee agreement violated Rule 2-200 of the California Rules of

Professional Responsibility which prohibited attorneys who were not partners, associates or

shareholders from splitting fees without a client's written consent and therefore Chambers

could not recover on the contract. *Id.* at 656, 658. Turning to quantum meruit, the court

further held the quantum meruit award could not be based on the fee the parties negotiated

without the client's consent:

> In essence, Chambers contends that, notwithstanding the absence of the required
> written client consent, he should be allowed to accomplish indirectly a division of
> fees under the guise of a quantum meruit claim. We reject the contention . . . . We
> perceive no legal or policy justification for finding that the fee the parties negotiated
> without the client's consent furnishes a proper basis for a quantum meruit award in
> this case.

*Id.* at 658.

California law precludes consideration of the fee percentage contained in a void

contingency fee agreement in determining a reasonable fee under § 6147(b). Alioto was not

entitled to an instruction allowing the jury to consider the contingency fee percentage in

determining a reasonable fee. There is no need for a new trial.

2.      Co-Counsels' Services

Alioto does not cite any case law in support of his claim the jury should have been

allowed to consider co-counsels' services in determining a reasonable fee. He cites only

to § 6147, saying because it allows him to collect a reasonable fee in place of the

contractual fee and because the Fee Agreement allows him to retain co-counsel, the reasonable fee should include co-counsel's work.  We disagree.

Quantum meruit is an *ex contractu* remedy.  It measures the reasonable value of services rendered without regard to the contract, not because of it.  *See Advanced Choices, Inc. v. Dep't of Health Servs.*, 107 Cal. Rptr. 3d 470, 480 (Cal. Ct. App. 2010). It does not follow that a reasonable fee has to include co-counsels' work because the contractual fee did.  Even looking to the Fee Agreement, however, it merely says Alioto is permitted to retain counsel to assist him and any additional counsel will not increase the amount of Hoiles's fee.  It says nothing about how Alioto intended to pay co-counsel. Because Alioto has not provided any further argument, we decline to address the issue further.

The court correctly reinstated the jury's quantum meruit verdict.

D.  Alioto's Fraud and Misrepresentation Claims

Alioto also raised fraud and misrepresentation claims.  He agreed, however, these claims only survived if the Fee Agreement is valid.

**AFFIRMED.**

**Entered by the Court:**

**Terrence L. O'Brien**
United States Circuit Judge

- 25 -

No. 10-1441, Joseph M. Alioto v. Timothy C. Hoiles

**KELLY**, Circuit Judge, dissenting.

This court affirms the district court on alternative grounds: that Mr. Alioto's claim for legal services performed for Mr. Hoiles's ex-wife and daughters (the Family Shares Issue) is a related matter and thus the Fee Agreement (Agreement) is voidable. The court further holds that Mr. Hoiles did not ratify the Agreement prior to voiding it, so the district court correctly reinstated the quantum meruit verdict.

I must disagree. In my view, the court's resolution ignores the essence of an attorney-client relationship. I would reverse the district court's judgment and remand for the district court to award Mr. Alioto 15% of the amount received by Mr. Hoiles for his shares and only his shares.

Mr. Hoiles contends that there are several related matters under Cal. Bus. & Prof. Code § 6147(a)(3). I agree with the district court that Mr. Alioto's attempt to claim fees for ostensible representation of the Family Shares is not a related matter. I disagree with the district court that Mr. Alioto's attempt to collect 20% from Mr. Hoiles based on an alleged oral modification of the Agreement (the 20% Issue) is a related matter. Further, Mr. Alioto's claim to fees for the recapitalization of Freedom (the Recapitalization Issue) is not a related matter because he was entitled to recover for efforts other than litigation. Because there are no related matters, the Agreement was not voidable under § 6147(b). Turning to the alternative grounds raised by Mr. Hoiles for invalidating the Agreement, I would reject them. Finally, I would conclude that Mr. Alioto cannot recover for the Family Shares under his fraud and misrepresentation claims as a matter of law. This

results in a recovery for Mr. Alioto of 15% of the amount received by Mr. Hoiles for his shares.

### A. There Are No Related Matters

#### 1. The Family Shares Issue

The Family Shares Issue is a "matter," but it is not "related" within the meaning of § 6147(a)(3). The court looks to the California Supreme Court's decision in Bay Cities Paving & Grading, Inc. v. Lawyers' Mut. Ins. Co., which defines "related" as "standing in relation; connected; allied; akin" and having "a causal connection as well as the 'notion of similarity.'" 5 Cal. 4th 854, 868 (Cal. 1993). But that definition must be read in context. The Bay Cities court held that two claims against an attorney were "related" because, *inter alia*, "[t]hey arose out of the *same specific transaction* . . . . [and] arose as to the *same client*." Id. at 873 (emphases added).

The district court found no evidence that Mr. Alioto was retained to represent Mr. Hoiles's ex-wife and daughters. No other conclusion is possible because no evidence supported the theory that Mr. Hoiles had any authority to act on their behalf. See IV App. 1196. Thus, as recognized by this court, the fee agreement simply does not cover the Family Shares. It follows ineluctably that Mr. Alioto's attempt to collect for the legal services he allegedly performed for the ex-wife and daughters cannot be "related" to his representation of Mr. Hoiles.

First, any representation of the ex-wife and daughters cannot have "ar[isen] of out the same specific transaction" as Mr. Alioto's representation of Mr. Hoiles. Bay Cities, 5

Cal. 4th at 873.  The Agreement *only* covers Mr. Hoiles and his shares.  Second, while the attorney may be the same, the client and the ostensible clients (Mr. Hoiles vs. his ex-wife and daughters) are totally different.  The issues here plainly did not arise as to the same client.  See id.

For the same reasons, I would hold that the Family Shares Issue did not "arise out of [Mr. Hoiles and Mr. Alioto's attorney-client] relationship."  § 6147(a)(3).  The attorney-client relationship is a special and voluntary one, founded upon consent and replete with fiduciary duties and ethical obligations owed by the attorney to his client.  Here, the ex-wife and daughters did not consider themselves to be Mr. Alioto's clients.  See, e.g., III App. 961–62, 966; IV App. 1090.  Moreover, Mr. Hoiles never purported to represent them or act as their agent in his dealings with Mr. Alioto.  See, e.g., III App. 754, 762, 803, 843, 850–51, 872, 946; IV App. 1159; V App. 1679–83 (answering "No," to the question: "[D]id you, at any time, ever have any kind of agency relationship . . . representing the interests of your former wife and your two daughters . . .?").  Mr. Alioto might have believed he was representing the ex-wife and daughters, but a lawyer's unilateral, subjective belief does not create an attorney-client relationship.  See Kerner v. Super. Ct., 141 Cal. Rptr. 3d 504, 530 (Cal. Ct. App. 2012).  Therefore, because the Fee Agreement never covered the ex-wife and daughters or their shares, the Family Shares Issue cannot have arisen out of Mr. Hoiles and Mr. Alioto's attorney-client relationship.  See, e.g., Thayer v. Kabateck Brown Kellner LLP, 143 Cal. Rptr. 3d 17, 32 (Cal. Ct. App. 2012) ("An attorney who undertakes to represent one spouse does not become the

legal representative of that client's wife . . . .").

Indeed, this conclusion is supported by the matters the California Court of Appeals has found to be "related"—an attorney's efforts to collect on a judgment and an attorney's post-settlement work. See Shumake v. Schwam, No. B1999587, 2008 WL 4458164, at *5 (Cal. Ct. App. Oct. 6, 2008) (time spent collecting the judgment); Tishgart v. DeJesus, No. A104244, 2004 WL 1941193, at *3 (Cal Ct. App. Aug. 31, 2004) (post-settlement work). Both involved incidental legal services performed by the same attorney for the *same client*. Thus, they arose out of the *same attorney-client relationship*.

This conclusion in no way undermines § 6147(a)'s goal of protecting the client. The statute requires contingency fee agreements to be in writing, which implies they include the name of the client and the attorney. The Fee Agreement complied with this requirement—it set forth the client (Mr. Hoiles) and the attorney (Mr. Alioto). Therefore, Mr. Hoiles was not misled as to whom Mr. Alioto represented and § 6174(a) indeed protected Mr. Hoiles from being held responsible for the work Mr. Alioto allegedly performed on behalf of the ex-wife and daughters.

2. The 20% Issue

Under Section 6147(a)(3), a "matter" must be some form of compensable legal service for the client outside the scope of representation contained in the agreement. Here, the 20% Issue is not a legal service and therefore is not a "matter" under § 6147(a)(3). Rather, it is an alleged oral modification of the Fee Agreement, in particular,

- 4 -

the fee percentage.

Again, this conclusion is supported by the issues the California Court of Appeals has found to be "related matters:" distinct ancillary legal services for which an attorney can be compensated. See Shumake, 2008 WL 4458164, at \*5; Tishgart, 2004 WL 1941193, at \*3. Thus, "claims for property damage, workers' compensation, disputes with a health care provider about the amount owed for their services, or claims for reimbursement (subrogation) by any insurance company for benefits paid under an insurance policy" are related matters where the scope of representation is confined to representing the client in pursuing a personal injury tort claim. See State Bar of California, Sample Written Fee Agreement Forms, Form No. 3 at 25 (last amended Nov. 19, 2010).

Mr. Alioto apparently felt justified in enforcing the otherwise invalid modification because of, *inter alia*, his perception that the work became more difficult when Mr. Hoiles insisted on seeking a fair value for all shareholders in order to obtain a fair value for his own shares. In some cases, there may be a fine line between a change in the scope of the work required by a client's demand and a related matter, as both may involve legal services. But this is not such a case because the 20% Issue simply is not a change in the scope of the representation between Mr. Hoiles and Mr. Alioto. Rather, it is an alleged oral modification of the Fee Agreement justified in part by the additional work created by the client's settlement posture within the *same matter*. At all times Mr. Alioto's "compensable legal service" remained the same: he worked to obtain the best price

- 5 -

possible for Mr. Hoiles's shares on terms Mr. Hoiles would accept.

Again, this conclusion is consistent with the purpose of § 6147(a), which requires contingency fee agreements to be in writing and to contain statements (1) of the agreed upon contingency fee rate, (2) as to how disbursements and costs incurred in the representation will affect the contingency fee and the client's recovery, (3) as to when clients could be required to pay compensation to the attorney for related matters arising out of their relationship not covered by the contingency fee agreement, and (4) that the fee is negotiable between the parties and not set by law. Obviously, the relevant time period is the time the agreement is signed as none of these requirements protects the client if it is not followed at the time the parties execute the agreement. Alderman v. Hamilton, 252 Cal. Rptr. 845, 847 (Cal. Ct. App. 1988) ("Attorney fee agreements are evaluated at the time of their making."). Here, the 20% Issue pertains to the requirement that a contingency fee agreement contain the agreed upon contingency rate in writing. The Agreement complied with that requirement at the time it was executed; it set forth the agreed upon contingency fee rate—15% of anything recovered before the filing of a complaint, 20% of anything recovered after the filing of a complaint but before the start of trial, and 25% of anything recovered after the start of trial. It is these percentages that are legally enforceable, not the alleged oral modification. Mr. Hoiles was not misled by the Agreement as to the applicable fee percentage at the time it was executed—indeed, § 6147(a) fully protected Mr. Hoiles from being bound by a subsequent oral modification

- 6 -

of that fee percentage.[1] See Stroud v. Tunzi, 72 Cal. Rptr. 3d 756, 761–62 (Cal. Ct. App. 2008) ("[M]aterial changes to a contingency fee agreement must comply with section 6147," but there is "no authority that invalid modifications to a contract nullify the contract.").

### 3. The Recapitalization Issue

In arguing the Recapitalization Issue is a related matter, Mr. Hoiles relies on the simple assertion that he hired Mr. Alioto to litigate. For support, he points to the Agreement, which entitles Mr. Alioto to a certain percentage of "anything recovered." I App. 85. Mr. Hoiles says the term "anything recovered" contemplates a settlement or judgment *in litigation* (which never occurred) and "not an unforeseen recapitalization and private stock sale to a third party that was available to all Freedom shareholders" which resulted from the work of the Special Committee, not Mr. Alioto's actions. Aplee. Br. 30–31.

But the Agreement's plain language allows Mr. Alioto to recover a 15% contingency fee for "anything recovered before the filing of a complaint." I App. 85. Obviously and understandably, the Agreement contemplates representation outside of litigation. Moreover, the Agreement states that Mr. Alioto would be representing Mr. Hoiles in the "Freedom Communications Matter." Id. That term is not defined in the Agreement and is ambiguous. Nevertheless, looking to the undisputed extrinsic

---

[1] Recognizing the invalidity of the oral modification, Mr. Alioto has not sought 20% under the contract in this litigation.

evidence, it appears both parties understood Mr. Alioto was being retained to assist Mr. Hoiles in divesting himself of his Freedom stock for a fair price, not necessarily to file a lawsuit. In fact, Mr. Hoiles admits he hired Mr. Alioto "for the purpose of advising and representing [him] and *possibly* filing a lawsuit in an effort to get a fair market price for [his] shares." III App. 858 (emphasis added). Therefore, the Recapitalization Issue is covered by the Agreement.[2]

### B. Mr. Hoiles's Alternative Arguments that the Agreement Is Unenforceable Are Unavailing

Mr. Hoiles claims that even if there are no related matters and the Agreement complies with § 6147(a)(3), it nevertheless is unenforceable because (1) it violates California Business & Professions Code § 6148 and Rule 3-300 of the California Rules of Professional Conduct, (2) it is unconscionable, (3) the contingency never occurred, and (4) Mr. Alioto did not "cause" a recovery. Aplee. Br. 48–53. I am not persuaded.

#### 1. Section 6148 and Rule 3-300

Section 6148 lists several requirements for attorney fee contracts "not coming within Section 6147." Because the Fee Agreement falls within § 6147, § 6148 does not

---

[2] Mr. Hoiles cites to several California cases defining "recovery" as a settlement or judgment in litigation. These cases are inapposite. First, the relevant term in the Fee Agreement is "anything recovered" not "recovery." Second, while recovery may mean a settlement or judgment in litigation in some contexts, the relevant context here is a specific fee agreement, which could not be clearer that it contemplates recovery outside of litigation.

apply here. That is true even though the Fee agreement contains an hourly fee provision. See Arnall v. Super. Ct., 118 Cal. Rptr. 3d 379, 381, 387 (Cal. Ct. App. 2010) (§ 6147 applies to "hybrid" fee agreements providing for a fixed monthly stipend and a variable "success fee"). The same result ensues with Rule 3-300, which forbids, *inter alia*, an attorney from acquiring an ownership interest adverse to a client unless certain conditions are met. The comments to the Rule clarify that it "is not intended to apply to the agreement by which the [attorney] is retained by the client, unless the agreement confers on the [attorney] an ownership, possessory, security, or other pecuniary interest adverse to the client" but does apply "where the [attorney] wishes to obtain an interest in [the] client's property in order to secure the amount of the [attorney's] past due or future fees." The California courts have indicated Rule 3-300 does not apply in the contingency fee agreement context even if it includes a charging lien. See Plummer v. Day/Eisenberg, LLP, 108 Cal. Rptr. 3d 455, 464 (Cal. Ct. App. 2010) ("A contingency fee agreement . . . need not comply with rule 3-300 to create an attorney's lien" because "charging liens are not only inherent in contingency fee contracts, they are almost universally found and almost universally uncontroversial in such contracts" (quotation omitted)). In any event, the Agreement entitles Mr. Alioto to a percentage of "anything recovered." While the Agreement could conceivably have given him an interest in Mr. Hoiles's property had Mr. Hoiles received some type of property in exchange for his shares, it is undisputed that Mr. Hoiles wanted his shares liquidated at a fair price. And all Mr. Alioto is seeking is a percentage of the proceeds Mr. Hoiles received from the recapitalization.

## 2. Unconscionability

Rule 4–200(B) of the California Rules of Professional Conduct describes the factors relevant to determining whether a particular legal fee is unconscionable; fee agreements which violate this rule may be deemed unenforceable on public policy grounds.  Cotchett, Pitre & McCarthy v. Universal Paragon Corp., 114 Cal. Rptr. 3d 781, 790–91 (Cal. Ct. App. 2010).  It states: "Unconscionability of a fee shall be determined on the basis of all the facts and circumstances existing at the time the agreement is entered into except where the parties contemplate that the fee will be affected by later events."  Rule 4-200 sets forth factors to be considered in determining the unconscionability of a fee:

> (1) The amount of the fee in proportion to the value of the services performed.  (2) The relative sophistication of the member and the client.  (3) The novelty and difficulty of the questions involved and the skill required to perform the legal service properly.  (4) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the member.  (5) The amount involved and the results obtained.  (6) The time limitations imposed by the client or the circumstances.  (7) The nature and length of the professional relationship with the client.  (8) The experience, reputation, and ability of the member or members performing the services.  (9) Whether the fee is fixed or contingent.  (10) The time and labor required.  (11) The informed consent of the client to the fee.

 "[A] fee that seems high or even one that is in fact high is not the same as an unconscionable fee."  Aronin v. State Bar, 801 P.2d 403, 407 (Cal. 1990) (quotation omitted).

- 10 -

The above factors weigh against a finding of unconscionability. Mr. Hoiles does not contest Mr. Alioto's claim that he is a highly experienced and skilled antitrust attorney. II App. 533; III App. 729–30, 786, 835, 850. At the time the Agreement was entered into, Mr. Alioto's representation of Mr. Hoiles could potentially have involved numerous hours and a lengthy litigation process. II App. 457. Mr. Alioto took a risk in taking on the representation. While the end result was very favorable (itself a factor weighing against unconscionability), Mr. Hoiles's father had failed in a previous effort to dissolve Freedom. Id.; III App. 781–82, 846–47. Mr. Hoiles was not an unsophisticated client and had at least one attorney (if not three) working with him when the Agreement was negotiated. II App. 508–09; III App. 814–16, 841; V App. 1632–33. And Mr. Hoiles was the one who insisted on a contingency fee arrangement. III App. 736, 784–85.

### 3. "Anything Recovered"

As discussed above, Mr. Hoiles's argument that "anything recovered" requires a settlement or judgment is belied by the Agreement which allows for a contingency fee for "anything recovered before the filing of a complaint." Moreover, Mr. Alioto agreed to represent Mr. Hoiles in the "Freedom Communications matter." That term may be ambiguous, but looking to the extrinsic evidence it appears both parties, including Mr. Hoiles, understood Mr. Alioto was being retained to assist Mr. Hoiles in divesting himself of his Freedom stock for a reasonable price. III App. 858. It follows then that "anything recovered" means anything Mr. Hoiles recovered for his stock.

## 4.  Causation

Contrary to Mr. Hoiles's argument, nothing in the Agreement requires it to have been Mr. Alioto's efforts which caused the recovery.  And obviously, as evidenced by the jury's quantum meruit award, Mr. Alioto did perform work on the Freedom Communications matter on Mr. Hoiles's behalf.  See Strong v. Beydoun, 83 Cal. Rptr. 3d 632, 635 (Cal. Ct. App. 2008) ("Quantum meruit refers to the well-established principle that the law implies a promise to pay for services performed under circumstances disclosing that they were not gratuitously rendered. . . .  The burden is on the person making the quantum meruit claim to show the value of his or her services and that they were rendered at the request of the person to be charged." (quotation omitted)).  Moreover, Mr. Hoiles admitted in a letter to his ex-wife and daughters that it was Mr. Alioto's efforts, at least in part, that resulted in Freedom's recapitalization.  See III App. 946 ("I truly believe that if we obtain a positive result it is in fact due to the work of Joe Barletta, Mr. Alioto, and the team (appropriately nicknamed 'the posse') he assembled and Christopher Shaw.").

## C.     Mr. Alioto's Fraud and Misrepresentation Claims

Mr. Alioto also argues he is entitled to recover from Mr. Hoiles a portion of the monies received for the Family Shares under his fraud and negligent misrepresentation claims.  According to Mr. Alioto, Mr. Hoiles told him at their first meeting and throughout the representation that Mr. Hoiles was acting on behalf of the Family Shares.

Mr. Hoiles argues that both claims fail because (1) there is no evidence Mr. Alioto justifiably relied on Mr. Hoiles's alleged oral representations that he was authorized to act on behalf of his ex-wife and daughters or that he would pay a contingent fee based on 15% of the monies they received and (2) Mr. Alioto cannot show damages. The latter argument defeats Mr. Alioto's recovery.

Both fraud and misrepresentation require the plaintiff to show damages. <u>Conroy v. Regents of the Univ. of Cal.</u>, 203 P.3d 1127, 1135–36 (Cal. 2009). Out-of-pocket and benefit-of-the-bargain are two measures of damages:

> The out-of-pocket measure of damages is directed to restoring the plaintiff to the financial position enjoyed by him prior to the fraudulent transaction, and thus awards the difference in actual value at the time of the transaction between what the plaintiff gave and what he received. The benefit-of-the-bargain measure, on the other hand, is concerned with satisfying the expectancy interest of the defrauded plaintiff by putting him in the position he would have enjoyed if the false representation relied upon had been true; it awards the difference in value between what the plaintiff actually received and what he was fraudulently led to believe he would receive.

<u>Alliance Mortg. Co. v. Rothwell</u>, 900 P.2d 601, 609 (Cal. 1995) (quotations omitted). "In California, a defrauded party is ordinarily limited to recovering his out-of-pocket loss . . . ."[3] <u>Id.</u> (quotation omitted); <u>see also</u> <u>Kenly v. Ukegawa</u>, 19 Cal. Rptr. 2d 771, 773 (Cal. Ct. App. 1993). Because Mr. Hoiles paid all expenses, Mr. Alioto has no

[3] An exception exists when the defrauding party stands in a fiduciary relationship with the victim of the fraud. In such circumstances the victim is entitled to both out-of-pocket expenses and benefit-of-the-bargain damages. <u>See</u> <u>Alliance Mortg. Co.</u>, 900 P.2d at 609–10 (collecting cases). Here, because Mr. Hoiles (the alleged defrauding party) was not Mr. Alioto's fiduciary, the exception is not applicable.

out-of-pocket losses. Thus, the fraud and misrepresentation claims fail as a matter of law.[4]

In short, I would hold that the Fee Agreement is valid and enforceable, but applies only to Mr. Hoiles and his shares. Therefore, Mr. Alioto's recovery is limited to 15% of the amount received by Mr. Hoiles for his shares.

---

[4] In the first appeal in this case, we said California law allows a plaintiff to recover benefit-of-the-bargain damages for fraud. Hoiles, 461 F.3d at 1236 n.7. In doing so, we relied on Robinson Helicopter Co. v. Dana Corp., 102 P.3d 268 (Cal. 2004), which in turn relied on Lazar v. Super. Ct., 909 P.2d 981 (Cal. 1996). But further review of Lazar reveals it was taken out of context. While not a model of clarity, Lazar only allowed both sets of damages because the plaintiff had both a contract claim *and* a tort claim. See 909 P.2d at 992. The California Supreme Court clarified this in Simon v. San Paolo U.S. Holding Co., 113 P.3d 63 (Cal. 2005). There, the plaintiff cited Lazar for the proposition that fraud plaintiffs may recover benefit-of-the-bargain as well as out-of-pocket damages. Id. at 73 n.4. The Court said that reliance was misplaced: "[O]ur reference in that decision to benefit-of-bargain damages was to their recovery under a *contract* cause of action." Id.; see also Roberts v. Redlands Centennial Bank, Nos. E028775, E029235, 2002 WL 1529614, at *10 (Cal. Ct. App. July 15, 2002) (unpublished) (same). This court is obligated to follow correct California law and is not bound by our previous interpretation of that law. See Homans v. City of Albuquerque, 366 F.3d 900, 904 n.5 (10th Cir. 2004) ("Dicta is not subject to the law of the case doctrine."); see also Christianson v. Colt Indus. Oper. Corp., 486 U.S. 800, 817 (1988) (prior decision regarding jurisdiction not binding where "clearly wrong").